HAROLD FITZSIMMONS, by Next Friend, MARGARET FITZSIMMONS, v. MISSOURI PACIFIC RAILROAD COMPANY and WALKER D. HINES, Director General of Railroads, Appellants.

Division One, June 16, 1922.

1. **PARTY DEFENDANT: Railroad Under Government Control.** Under the Federal Control Acts of August 29, 1916, and March 21, 1918, and Order No. 50 of the Director General of Railroads, the railroad company was not a proper party defendant to an action for personal injuries sustained in June, 1918, and brought in the circuit court of Missouri in January, 1919, while said railroad was being operated by the Director General under said acts and the proclamation of the President.

2. **NEGLIGENCE: Violent Movement of Freight Cars in Switch Yard.** The use of unusual, unnecessary, extraordinary and dangerous force and violence in shunting cars from one track to another in

a switch yard constitutes negligence; and the facts of this case made a case for the jury on the question whether the defendant drove its car against plaintiff with such great and unusual force as to constitute actionable negligence, where his duty required him, a seventeen-year-old boy, engaged in defendant's service as yard clerk for about nine months, to pass among cars set on twenty-one tracks, check their initials, numbers, contents and seals and fasten a card upon each showing its destination and route, and where, as he passed ten feet below the end of a car, other cars, without warning to him, were driven against its other end with such force and suddenness as to strike him, there being evidence that he had been told by the yard chief, before he entered upon such employment, that it was necessary for his safety that he pass ten feet from the end of a stationary car in crossing a track and that he would be warned by the engine bell when cars were to be kicked down the track, and that he had never seen or known of so violent a movement and that no bell was rung.

3. ————: Contributory Negligence: Knowledge of Danger: Apportionment: No Instruction. In an action for personal injuries based on the Federal Employers' Liability Act, it will not be assumed that mere knowledge of the danger to which plaintiff's work subjected him constituted contributory negligence on his part; and although his instruction required the jury, before they could find for him, to further find that because of his youth and inexperience he was unacquainted with and was not warned of the dangers of the situation, and there was no evidence upon which to base such requirement, the defendant cannot complain that the instruction did not announce that such knowledge of the danger constituted contributory negligence and require an apportionment of the liability according to the negligence of the respective parties, where defendant did not present such defense to the trial court by an appropriate instruction of its own.

4. ————: Instruction: Liability of U. S. Government: Favoritism. In an action brought against the Director General of Railroads for injuries sustained while the U. S. Government was operating the railroads, an instruction which attempts to impress the jury that the Government, being primarily liable to plaintiff for any verdict they may render, is entitled to more favorable consideration at their hands than would be the railroad company were it the defendant, should be refused.

5. ————: Unobstructed View: Looking: No Evidence: Instruction. An instruction for defendant, telling the jury that if plaintiff had an unobstructed view and by looking could have seen the car ap-

proaching which struck him, then it was his duty not to cross the track in front of said car, is properly refused where there is no evidence to support it.

6. **ARGUMENT TO JURY: Remarks Withdrawn.** Where remarks of respondent's counsel in his argument to the jury were, upon objection, distinctly and definitely withdrawn, and it is doubtful if under the circumstances they were improper, and no further remedy in respect to them was asked, they will not be deemed error on appeal.

7. **EXCESSIVE VERDICT: Loss of Leg.** The plaintiff, a boy seventeen years of age, at work in a railroad switch yard, was knocked unconscious by being suddenly hit by a car, and a wheel ran over his leg, and as a result the leg was amputated four and three-fourths inches below the knee; at the time of the trial, sixteen months later, neurosis was manifest in the performance of the functions of the bladder, and there was much soreness in the part of the leg from which the limb was severed, which made it necessary that the leg as much as possible be relieved from the pressure incident to using an artificial limb; but the evidence does not indicate unusual delay in recovery. *Held,* that the judgmnt ought not to be permitted to stand for a greater amount than ten thousand dollars.

Appeal from Jackson Circuit Court.—*Hon. Daniel E. Bird,* Judge.

AFFIRMED (*upon condition*).

*Edw. J. White, Thomas Hackney* and *Leslie A. Welch* for appellants.

(1) The demurrer of defendant Missouri Pacific Railroad Company should have been sustained, because at the time of the injuries its properties were in the exclusive possession and control of · the United States Government, and plaintiff was not the employee of said company. North Pac. Railroad v. North Dakota, 250 U. S. 135; Erie Railroad v. Caldwell, 264 Fed. 947; Krichman v. United States, 263 Fed. 543; Hanbert v. Railroad, 259 Fed. 361; Mardis v. Hines, 258 Fed. 945; Foster v. Western Union, 219 S. W. 107; Cravens v. Hines, 218 S. W. 912. (2) The demurrer of defend-

ant Hines should have been sustained because there was no competent evidence of negligence on the part of said defendant. (a) There was no competent evidence that the cars moved with unusual force and rapidity. The conclusions of the plaintiff's witnesses that the moving of the cars one-half to one car-length was unusual was contrary to the undisputed physical facts and the laws of nature, and constituted no evidence that the crew at the time in question were negligent or cut the cars off in an unusual manner. In approaching this question this court must start with a recognition of its oft repeated rule that there was no duty on the part of the defendant to keep a lookout for nor to give warning signals of the approach of cars to a yard clerk. The company had the legal right to assume in switching cars that the plaintiff would look out for his own safety and keep out of the way of moving cars. Rashall v. Railroad, 249 Mo. 520; State ex rel. Lusk v. Ellison, 271 Mo. 463; Aerkfetz v. Humphreys, 145 U. S. 418; Degonia v. Railroad, 224 Mo. 564; Gabal v. Railroad, 251 Mo. 257; Nivert v. Railroad, 232 Mo. 626; Cahill v. Railroad, 205 Mo. 393; Nugent v. Milling Co., 131 Mo. 252; Sexton v. Met. St. Ry., 245 Mo. 272; Baker v. Railway, 122 Mo. 589; Hook v. Mo. Pac. Ry. Co., 162 Mo. 580. "Any evidence, especially when based on estimates or opinions, must yield to the physical facts." Underwood v. West, 187 S. W. 86; Wray v. E. L. Co., 68 Mo. App. 389; Beaton v. Railway, 123 Minn. 178; Penland v. Ingle, 138 N. C. 456; Adams v. Ins. Co., 76 Pa. 411. (b) There was no substantial evidence that defendants negligently failed to warn plaintiff of the "dangers of his ordinary duties." Under the decisions of the courts of this State and the plaintiff's own testimony this court cannot hold the defendant negligent in failing to give this plaintiff further warning of the dangers necessarily incident to his duties as a yard clerk. Nugent v. Milling Co., 131 Mo. 241; Herbert v. Shoe Co., 90 Mo. App. 305; Stegman v. Gerber, 123 S. W. 1041. The only

question in the case at bar on this feature is whether the dangers in this yard were so glaring and obvious that the railroad had the right to presume that plaintiff was, through his ten months' experience, familiar with them. His mere *ipse dixit* that he was not or that Sullivan told him he could safely go ten feet behind the cars will not help him. Dyrcz v. Packing Co., 194 S. W. 764. Fitzsimmons' claims of unfamiliarity are untenable. Gwinn v. Power Co., 195 S. D. 506. (3) The undisputed physical facts show that plaintiff's own negligence in failing to look up the clear and unobstructed track before stepping behind the cars was the sole cause of his injuries. Yet, plaintiff testified that he looked and listened and saw or heard nothing as he walked from track 33 to 29, although it was rather quiet that morning. But this court has repeatedly held that no probative force could attach to a statement of a witness that he looked and didn't see when it was his duty to look, and to look was necessarily to see. Sexton v. Railway, 245 Mo. 272; Baker v. Railway, 122 Mo. 589; Hayden v. Railroad, 124 Mo. 566; Sanguinette v. Railroad, 196 Mo. 494. (4) Plaintiff's Instruction 1 was erroneous. (a) In submitting to the jury an allegation of negligence which had no substantial evidence to support it, even though submitted in the conjunctive. Under this heading we raise a new question, one never before this court before, so far as we can ascertain. It is this: Plaintiff submitted his case upon two different theories of negligence stated in the conjunctive. We strenuously deny that there was sufficient evidence to entitle plaintiff to go to the jury upon either one. But supposing this court should hold there was a jury issue on one and not the other, e. g., suppose this court should hold a jury issue on failure to instruct and none on the unusual violence theory, or *vice versa*. In that event would the error be harmless in an action under the Federal Employers' Liability Act? We are fully aware of the decisions of this court to the effect that where plaintiff

submits his case on two theories of negligence stated in the conjunctive, only one of which is supported by sufficient evidence to go to the jury, the error is harmless because plaintiff has required the jury to find more than was necessary to entitle him to recover and he merely took unto himself an unnecessary burden. But those decisions were under the state law where the jury in order to find for the plaintiff at all, had to find that the defendant was negligent and that plaintiff was free from all contributory negligence, and where contributory negligence, if it existed at all, was a complete bar to a recovery by plaintiff regardless of the question of defendants' negligence or how plaintiff's and defendants' negligence might compare. The unquestioned rationale of those decisions is not applicable to the Federal Liability Act cases, because of the latter's comparative negligence rule. Under the state law, if the plaintiff is wholly free from negligence and the defendant is guilty of only one charge of negligence, then plaintiff is entitled to his full damage and the fact that there was no evidence of the other charges of negligence stated conjunctively in the instruction could not be harmful. But, under the Federal act, the more negligence on the part of the defendant the jury is permitted to find, the greater shall be plaintiff's recovery. If the plaintiff is guilty of as much negligence as the defendant then the verdict should be for one-half the damage. But if the defendant was guilty of nine times as much negligence as the plaintiff then the verdict should be for nine-tenths of the damage. Therefore would it not be palpably erroneous to permit the jury in a Federal Act case to find that the defendant was negligent in ten respects when there was evidence of his negligence in one respect only? Take the instant case: The plaintiff strenuously contended to the jury he was damaged to the extent of $30,000; he claimed the defendant was negligent in two respects; the evidence clearly showed the plaintiff was guilty of negligence in failure to look before going

on the track. Now the jury, under the instruction, was obliged to find the defendant guilty in two respects in order to find for the plaintiff. Therefore the instruction in effect told the jury: "If you believe plaintiff was damaged to the extent of $30,000 and the plaintiff was negligent in one respect and the defendant was negligent in two respects your verdict should be for $20,000." Said instruction plainly told the jury that they could find the defendant guilty of negligence in twice as many respects as there was evidence of; in fact it told them they were required to find negligence in both respects if they found for plaintiff at all, because the instruction said "plaintiff can recover if you find this and this." In submitting two issues the trial court in legal effect told the jury there was competent evidence of negligence in both respects and the most plausible explanation of the amount of the verdict is that the jury did just what the court erroneously told them they could do. Therefore, if this court should be of the opinion that plaintiff made a jury issue on one theory, which we strenuously deny, and not the other, it should certainly lay down the doctrine that in actions under the Federal Act a jury cannot be permitted to find a defendant guilty of more negligence than the evidence justified. (b) Because there was no evidence to justify a finding that the "defendant knew or by the exercise of ordinary care would have known" that the plaintiff was not familiar with the dangers of his ordinary duties. It is elementary that it is not negligence to fail to warn unless the employer should have known the employee needed warning. (c) Because the issue of "unusual force and violence" was improperly submitted without evidence of any unusual conduct on the part of any of the switching crew in making the cut in question. Beaton v. Great Northern Ry. Co., 123 Minn. 178. (5) The verdict was excessive. Kibble v. Railroad, 227 S. W. 46; Newcomb v. Railroad, 182 Mo. 726; Farrar v. Railroad, 249 Mo. 227; Kinney v. Railway, 261 Mo. 97; Brady v. Railroad, 206 Mo. 509; Applegate v. Railroad, 252 Mo. 202.

*Atwood, Wickersham, Hill & Popham* and *Burr S. Stottle* for respondent.

(1) The whole matter of Federal control over railroads has been recently reviewed by this court. Hite v. Railroad, 225 S. W. 916; Kersten v. Hines, 223 S. W. 590; Hanks v. Hines, 219 S. W., 978; McGregor v. G. N. Railroad, 172 N. W. 841, 4 A. L. R. 1635; Fed. Stat. Ann. (2 Ed.) 775 (1919 Supplement). (a) The court may affirm the case as to one defendant and reverse it as to the other. Craven v. Hines, 218 S. W. 915. (b) The judgment in a case of this kind is not considered as an entirety, and may be affirmed as to one defendant and reversed as to the other. Adair v. K. C. Term. Ry. Co., 220 S. W. 928; Craven v. Hines, 218 S. W. 915. (2) There was ample evidence of negligence on the part of defendant. (a) The unusual handling of the cars constitutes negligence. Provance v. Ry. Co., 186 S. W. 955; Patrum v. Railroad Co., 259 Mo. 109; Note, 7 L. R. A. (N. S.) 1076; Farmer v. Ry. Co., 178 Mo. App. 579; Gobal v. Railroad, 251 Mo. 257; Chicago Ry. Co. v. McGrath, 203 Ill. 511. (b) There was ample competent evidence of unusual movement of the cars. Daniels v. Railroad, 181 S. W. 600; Farmer v. Railway, 178 Mo. App. 584; Henry v. Sioux City Ry. Co., 75 Iowa, 88; L. & N. Ry. Co. v. Watson, 90 Ala. 71; Pipes v. Railroad, 184 S. W. 82; Stotler v. Railroad, 200 Mo. 124; 1 Wigmore on Ev. art. 436; Farmer v. Ry. Co., 178 Mo. App. 579; Yongue v. Railroad, 133 Mo. App. 141. (c) Defendant was negligent in failing to give plaintiff proper instruction and warning concerning the dangers of his employment and how to avoid them. Dowling v. Allen, 74 Mo. 13; Bulson v. Shoe Co., 191 Mo. App. 133; Goins v. Ry. Co., 37 Mo. App. 233; Czernicke v. Ehrlich, 212 Mo. 396; Hearon v. Himmelberger Lbr. Co., 224 S. W. 67. (3) Plaintiff was in the exercise of ordinary care for his own safety. Sullivan v. Hines, 218 S. W. 408; Benedict v. Ry. Co., 104 Mo. App. 218; Goods v. Coal Co., 167 Mo. App. 172;

Pennsylvania Co. v. Cole, 214 Fed. 950. (4) There was no error in plaintiff's instruction 1. Brasel v. Cooperage Co., 220 S. W. 988; Troutman v. Cotton Oil Co., 224 S. W. 1016. (5) The verdict was not excessive. Greenwell v. Railway, 224 S. W. 404; Miller v. Hoopster, 273 Mo. 605; Yost v. Railroad, 245 Mo. 252; Roth v. Union Depot Co., 13 Wash. 525; Mullery v. Tel. Co., 191 Mo. App. 118.

BROWN, C.—This is a suit under the Employer's Liability Act for personal injuries received by plaintiff while in the employment of the defendant the Missouri Pacific Railroad Company as a yard clerk, while engaged in checking cars in the Kaw Bridge Transfer Yard in the west bottoms in Kansas City, Kansas. The injury complained of consists of the loss of the right leg, which was crushed by the wheels of a car which ran over it. It was amputated four and three-fourths inches below the knee. Thirty thousand dollars is asked as damages.

Plaintiff, at the time of the accident, which occurred on June 25, 1918, had been employed by the defendant railway company in the same work about nine months, and as a messenger during the previous four months. The plaintiff at the time of the injury was seventeen years old. He was knocked down and run over by a car which, while sitting on one of the transfer tracks, was suddenly moved by other cars being placed on the same track. The negligence charged on which the case was submitted was, in substance, that three cars were negligently kicked into the track with great and unusual force and violence, and without warning, so that two cars already standing on the track, across which plaintiff was passing in the discharge of his duty, were suddenly moved against him, knocking him down and causing the injury, and that the plaintiff was young and inexperienced and that the defendant company had negligently failed to warn him or instruct him with respect to such a danger.

The answer consists of a general denial, and the charge, in substance, that the plaintiff had negligently placed himself in the position of danger, from which negligence the injury resulted. The appellants state these issues as follows: "(1) Whether there was any competent evidence that the dead cars were kicked with unusual violence, and (2) whether plaintiff, with his nine or ten months' experience as yard clerk, in addition to his other experience, was unfamiliar with the dangers and entitled to further warning and instruction."

The layout consists of twenty-one tracks extending in an east and west direction and numbered from south to north from 19 to 39 inclusive. These tracks are used for making transfers of cars to connecting lines, both east and west of the state line, which extends north and south through the east end of the yard, a track being assigned to each company participating in the business. They are reached from the Missouri side of the state line, which is marked roughly by the James Street viaduct, under which the tracks approaching from the Missouri side pass. The cars enter and leave the yard over a ladder track, passing to and from it in seven leads, three of which connect north of the viaduct and four south of it. These leads reach all the twenty-one transfer tracks by switches, to which the cars are shunted as they enter, and upon which they are moved by gravity, the yard having a slight downward gradient from the east end to the transfer tracks at the west. This accident occurred on track 29, the middle transfer track of the yard, which we will follow over its course from its west end to the ladder over which cars destined to it are received. Passing east about four hundred and fifty feet, it enters by a frog track, number 30, the next track to the north; passing thence in a curve to the south about ninety-five feet it enters track 31; thence along track 31 in a practically straight line, one hundred and ten feet to track 27 under the viaduct; thence along tracks 27 and 26 to the connection with the ladder. These transfer

tracks, including numbers 29 and 30, were nine feet apart, making a distance of fourteen feet from center to center.

These tracks were gravity tracks, that is to say, from the eastern entry they had a slight slope to the west, so that after the cars had been started down the yard by the engine and released they would continue to run slowly of their own weight and momentum down the track. If there was no car already on the same transfer track one of the switchmen would ride it down, and, when it reached the proper position, would set the brakes, so that it would act as a bumper to stop the next car. If there was more than one car in the bunch he would set the brakes on the front or west car. When the switch engine came into the east or upper end of the yard with its car or cars ahead of it, a switchman would pass down the tracks and throw the switches into position to shunt them to the proper track. The engine would then move down the track, shoving them in front of it, and when the proper speed had been attained would stop and let them move to their position. This process was called "kicking them," and the movement was handled in such a way as to avoid any sudden blow or collision which could injure the contents, whether it might be live stock, eggs, the most delicate machinery, or other fragile freight requiring careful handling.

It was the duty of plaintiff as yard clerk to examine and check these cars by taking their initials, their numbers, their contents, the number of their seals and their destination, and if not already carded with their destination to card them. He went to track 33 to check two cars of live stock on that track, and having finished he went south across tracks 32, 31 and 30, to track 29, to check two loaded cars that stood together on that track, the brakes of the west one of them being set and the east end of the other being just clear of the switch which led to the track. To do this work he had to go to the south side of the cars. When on tracks 31 and 30 he looked east to see if anything was coming west on that track, and could see nothing. When he came to track 29 he

looked east and also listened, and could neither see nor hear anything coming, and began walking around the car ten feet from the west end. There was an awful bang and the car struck him in the back as he says, just like a shot out of a gun. He had no time to think of anything. He found himself lying with his head toward the east, and the car had passed over his leg. The plaintiff testified that when he went to work Mr. Sullivan, the yard clerk, told him that in passing the rear of cars standing on the track he should go ten feet behind the car to avoid danger, and that when dead cars were to be moved there would be a warning given by the engine bells. The plaintiff also stated that he had never been warned in any manner that it was dangerous to cross the tracks in accordance with these instructions.

Further reference to the testimony will be made as necessary. At the close of all the evidence the defendant railroad company asked the following instruction:

"The court instructs the jury that under the pleadings and all the evidence in this case the plaintiff is not entitled to recover from the defendant Missouri Pacific Railroad Company, and your verdict must be for the defendant Missouri Pacific Railroad Company."

Which was refused and said defendant excepted. The defendant Hines, as Director General of Railroads, also asked a similar instruction, which was refused, and said defendant duly excepted. Thereupon the plaintiff asked and the court gave the following instruction:

"The court instructs the jury that if the jury find and believe from the evidence that on June 25, 1918, plaintiff was in the employ of defendants as a car checker in the yards of the Missouri Pacific Railroad Company referred to in evidence and that at the time of the injury, if any, to plaintiff, referred to in evidence, he was on his way to check two standing cars, if you so find, on track 29, mentioned in evidence, and that said cars had been moved by defendants, if you so find, from Missouri, into Kansas, and were to be checked and moved by defendants, if you so find, back into Missouri and were

loaded for transit at said times, if you so find, and that defendants and plaintiff at the time of said injury, if any, were engaged in interstate commerce, if you so find, and that defendants negligently, if you so find, caused to be shunted or kicked other cars against said standing cars on track 29, if you so find, with unusual, extraordinary and unnecessary rapidity and force and violence, if you so find, and that thereby defendants were negligent, if you so find, and that by reason thereof said standing cars were violently struck by said other cars and shunted and set in motion and moved with excessive, unusual and dangerous rapidity, if you so find, on to and against plaintiff, if you so find, and he was by said cars run over and injured, if you so find, and that plaintiff was at said time performing the duties of his employment, if you so find, and that the performance of said duties, if any, and the performance of his usual duties as car checker in said yards required him to cross and be around and about the tracks and moving cars and trains, if you so find, and that the performance of his ordinary duties in said yards was dangerous and involved great danger to plaintiff and his person, if you so find, and that plaintiff was at said time about seventeen years of age and was inexperienced, unwarned and uninstructed as to such dangers, if any, if you so find, and that by reason of his youth, if any, and his inexperience, if any, as to such dangers, if any, he was unaware of and did not appreciate such dangers, if any, if you so find, and that defendants knew or by the exercise of ordinary care would have known of all of the above facts, if any, in time thereafter by the exercise of ordinary care, to have warned and instructed plaintiff as to such dangers, if any, before he was injured, if you so find, and that defendants negligently, if you so find, failed to exercise ordinary care to warn or instruct plaintiff as to such dangers, if any, and that thereby defendants were negligent, if you so find, and that as a direct result of the negligence, if any, on the part of defendants, as hereinbefore set out, plaintiff sustained his injuries if any,

if you so find, and that he was not injured as the result of any of the risks assumed by him, if you so find, as set out in the other instructions herein, then your verdict must be for plaintiff and against defendants.

"The terms 'negligence,' 'negligent,' 'negligently' and 'ordinary care' as used in this instruction and the other instructions are defined in other instructions herein given you."

Defendants also assigns for error the refusal of their instructions number five and six, which are as follows:

"5. The court instructs the jury that if you find and believe that the plaintiff while on either track 31 or 30 had an unobstructed view to the east and could by looking have seen the cars alleged to have been kicked onto track 29 as they approached said track, then it was the duty of the plaintiff not to attempt to cross track 29 in the face of said approaching cars.

"6. The court instructs the jury that while the Missouri Pacific Railroad Company is a defendant in this action, it is established by the evidence and admitted by the pleadings that the Director General of Railroads of the United States was operating the railroad at the time of the accident in question, and you are instructed that the primary liability, if any, in this case is on the Government of the United States and not said railroad company, and that if any judgment is rendered in this cause in favor of the plaintiff said judgment would be payable by the Government, and the Government would be obliged to indemnify said railroad company on account of any such judgment against it. Therefore, in the trial of this cause and in weighing the testimony and determining the issues herein you should disregard the fact that one of the defendants is a railroad corporation and should try the case with the same impartiality as if the case was between the plaintiff and the Government of the United States."

Also the action of the court with respect to alleged errors in the admission of testimony, remarks of counsel during the trial and the excessive amount of the verdict.

I. Both defendants seem to agree perfectly upon the proposition that the plaintiff is not, upon the evidence, entitled to a verdict and judgment against either, but here their paths diverge. The defendant railroad company contends that the wrong and injury charged was the act of the United States Government in

**Railroad as Party.** control of the railroad through its Director General of Railroads, and it is consequently solely liable. This presents the first question involved in this appeal, and we will briefly consider it.

On August 29, 1916, Congress passed the act which has been designated as the Federal Control Act, giving the President power, in time of war, to take possession of the transportation systems of the country and to use them for war purposes to the exclusion of all other traffic so far as necessary for military purposes. War was declared with Germany in April, 1917, and on December 26, 1917, the President, referring to this power, proclaimed that as of twelve o'clock noon on the 28th day of December, 1917, he took possession of every system of transportation included in the terms of said act, with its appurtenances, to the end that they be utilized for the transfer and transportation of troops, war material and equipment as may be desirable to the exclusion of all other traffic and subject to such use to be employed in the transportation of all other traffic.

This act of Congress and the proclamation of the President thereunder by their terms, not only sequestered the entire property of these transportation systems, but the working organizations owning and operating the same, including its officers and directors, who in so far as their service in that respect was involved became the servants of the Government under the Director General appointed by the proclamation. The same absolute power by which the Government, under its war power, availed itself of the service of the conscript for the compensation provided by law, was applied to the acquisition, not only of these transportation properties, but of the services of the officers and directors constituting the personnel of

the corporate ownership, for a compensation to be subsequently fixed according to the terms of the act of sequestration. No doubt is cast upon the power of the Federal Government to do this, nor has any question been raised as to its power to cast upon the corporate owner of the transportation property liability for damage which might be inflicted by such corporate owner through its directors or officers in the operation of the property under the direction and supervision of the Director General, unless the wrongful act resulting in such damage had been done by the express order of the latter. The question we are suggesting does not relate to the power of the Federal Government acting through the Director General; it relates only to what it has actually done in pursuance of that power. Nor does it relate to the ultimate liability for such injuries as are charged in this case, as between the Government and the corporate owner. All these matters are left by the terms of the Federal Control Act and proclamation of 1917 to be justly and equitably settled between the parties. The only question is as to what has already been done in the acts of Congress, proclamations and orders relating to this matter by way of determining the proper (not the necessary) parties defendants in such a suit.

That the corporation is a proper party has been generally held by the courts of the several states, including Missouri. [Hite v. St. Joseph & Grand Island Railroad, 225 S. W. 916.] The propriety of this is evident, for what could be more reasonable than that those who might finally be affected by the result of a controversy should be somewhere and somehow permitted to defend their conduct as well as their interests?

That their right to do so, which had been frequently questioned although always sustained, had its influence upon Congress is shown by the Federal Control Act of March 21, 1918, which is as follows:

"Carriers while under Federal Control shall be subject to all laws and liabilities as common carriers, whether arising under State or Federal laws or at common

law, except insofar as may be inconsistent with the provisions of this act or any other act applicable to such Federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, *no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal Government.* " [U. S. Comp. Stats. 1918, sec. 3115 3/4 j.]

Nothing could be more just or more reasonable than this simple provision couched in words which a child could understand, and yet, on October 28, 1918, shortly before this action was instituted under the Act of Congress which we have cited, the Director General issued his order Number 50 purporting to repeal the section we have quoted by the following provision:

"It is therefore ordered, that actions at law, suits in equity, and proceedings in admiralty hereafter brought in any court based on contract, binding upon the Director General of Railroads, claim for death or injury to person, or for loss and damage to property, arising since December 31, 1917, and growing out of the possession, use, control or operation of any railroad . or system of transportation by the Director General of Railroads, which action, suit, or proceeding but for Federal control might have been brought against the carrier company, shall be brought against the Director General of Railroads, *and not otherwise;* Provided, however, that this order shall not apply to actions, suits, or proceedings for the recovery of fines, penalties, and forfeitures." (Italics ours.)

Had this order been issued by the President there might have been reason for holding that it was supported by the provision of Section 10 of the Control Act of March 21, 1918. Upon this question it is quite unnecessary for us to intimate an opinion, and it is sufficient

to say that it was generally disregarded by the state courts, which held it to be void. [Franke v. Railway, 170 Wis. 71; McGregor v. Railway, 172 N. W. (N. D.) 841; Parkinson v. Railway, 178 N. W. (S. D.) 293; Mobile Ry. Co. v. Jobe, 84 So. (Miss.) 910; Lavalle v. Railway, 143 Minn. 74.] The Act of March 21, 1918, having already applied the remedy which the Legislature considered just and expedient by providing that no levy should be made upon the property of the carrier corporations without the consent of the Director General, it seems reasonable that the question whether the United States or the railroad corporation should respond to such judgments should be left for determination according to the facts of each particular case.

Notwithstanding the array of authorities to the contrary the Supreme Court of the United States, the supreme judicial arbiter in such cases, held to the contrary in Missouri Pacific Railroad Co. v. Ault, 41 S. C. Rep. 593, decided June 1, 1921, on error to the Supreme Court of Arkansas, which had affirmed the judgment of the trial court against both the company and the Director General. Although this was a suit for what the court determined to be a penalty, which accrued during Government operation, the judgment was reversed as to both defendants, but the point now before us was fully considered and determined as we have stated. The same conclusion and result has been reached in Mardis v. Hines, 267 Fed. 171, decided August 23, 1920, and by us in Adams v. Quincy, O. & K. C. R. Co., 229 S. W. 790, decided April 9, 1921.

Upon the controlling authority of these cases we hold that the railroad company was not a proper party in this case.

II. Proceeding to the merits of the case, we are confronted with the question whether or not the evidence is sufficient to authorize a verdict for the plaintiff against the defendant Hines; that is to say, whether the injury resulted from the act of defendant in driving its car

against the plaintiff with such great and unusual force and violence under such circumstances as to constitute actionable negligence. It is admitted that, at the time of receiving the injury, the plaintiff was seventeen years old, and had been in the service of the defendant corporation about nine months in the capacity of yard clerk, his duty requiring him to pass among the tracks upon which cars, both loaded and empty, were set for transfer, checking their initials, numbers, contents, the number of the seals and fastening a card upon them bearing their destination and route from the yard. To do this it was, of course, necessary that he should go among the cars and among the tracks, giving all necessary time and attention to the work. The defendants, in their argument, have urged upon our attention with great earnestness, the simplicity of the operation which constituted the danger in this work, and made it obvious to all alike with little regard to age or special experience. We are impressed with this view and will give heed to our own impression of the physical facts in an attempt to roughly consider the evidence.

*Actionable Negligence: Unusual Movement of Cars.*

This yard was used, as we have said, in the transfer of cars loaded and empty, from the defendants' railroad to other lines. There were twenty-one tracks in all on which cars were set for transfer, lying side by side, fourteen feet from center to center, numbered consecutively from south to north from 19 to 39, extending west from their approaches, which entered the yard at the southeast corner and terminating in dead ends at the west. It is called sometimes a hump yard, because from that point the gradient of the leads to the several tracks where the cars are set descends slightly, so that cars once started and released keep running by gravity, being shunted from track to track by switches connecting with other tracks of the system, until their career is stopped at the west end. The track on which this accident occurred was number 29, the middle track of the system

of twenty-one; that is to say, ten of these tracks were situated on either side of it. In the statement which precedes this opinion we have followed this track throughout its entire length from the west end to the place where it enters the yard at the southeast corner, a distance which may be roughly stated at eight hundred feet. About four hundred and fifty feet along this track from the west end is the frog of a switch which connects with track 30 lying next north of it. This distance limits the storage capacity of each of these two tracks. It then swings upon a curvature to the southeast to a switch connection with track 31, thence on a practically straight course in a southeasterly direction, passing two more switching connections with other tracks, to the ladder, or track by which all cars enter and leave this yard. The west end of this track from the switch connection with track 30 to the dead end was level, and used for the transfer of cars to and from the Burlington lines, and on the day of the accident two loaded cars sat upon it, the east end of the eastern one being at about the point of clearance between the two tracks. This seems to be practically conceded by both parties, as is shown in the cross-examination of the plaintiff, during which there was shown a photograph accepted by him as practically correct. The two cars were coupled together, and the brakes were set on the west car, according to a custom by which a switchman rode the first or west car placed upon the transfer track, setting the brakes to hold it in position, before leaving it. As other cars were placed upon the same track they were shoved by the switch engine over the hump, all the switches having been set to shunt it into the proper position, and was then "kicked" with sufficient force to keep it in motion until it should couple with the east car already on that track. Sometimes it would fail to make this run and would then have to be shoved to position by the switch engine.

When plaintiff, at sixteen years of age, entered the service of the defendant company as a messenger boy,

his duties consisted of carrying messages between the general office and the several yard offices.   This took him into the yards, and Mr. Sullivan, the chief yard clerk, says that he then told him to be careful and to "always give the end of the car a good clearance; in other words, to never step in the front of a dead car on any of them tracks in the bull ring."   Mr. Sullivan further stated, in substance, that he never talked with the boy after his promotion to the position of yard clerk, in which his duties all pertained to his work among the cars.

Plaintiff states with some detail the advice of Mr. Sullivan.   He says that he was told by Mr. Sullivan that if he kept ten feet from the ends of the cars he would be perfectly safe, and that before the cars were kicked down the yard the engine bell would give warning.   Mr. Sullivan makes no direct denial of this in his testimony, and the jury was fully justified in assuming the truth of the plaintiff's statement if the question was before them for consideration.   The defendant insists that it was not before them, and that the case should be tried solely upon the issue whether this car was run upon the plaintiff in an unusual, as well as dangerous manner, and that however dangerous the method adopted had been, there could be no recovery if it was habitually practiced in that particular yard.   This theory has of course no relation to the doctrine of contributory negligence, which is no defense in actions founded, like this, on the Federal Employer's Liability Act.

It is freely stated by the defendant, and its evidence shows, that cars were kicked down the yard at a speed of ten miles per hour, which is equal to about fifteen feet per second, without any signal or warning to those performing their duties upon or about the tracks.   One of the switchmen engaged in the same movement expresses the attitude of the company in that respect by his sworn statement to the effect that it was sometimes careful in that respect to prevent injury to the cars and their contents, but paid no attention to the employees,

and this seems to be the theory upon which the defense is placed. In other words, that the company will take care of cars, live stock and other fragile freight, while employees must look out for themselves. The facts of this case will illustrate the tendency of this humane doctrine.

The two cars occupying track 29 at that time being just clear of the switch, there was no room for anything else on that track. The switchman who had just lined the switch for track 29 knew it, and knew that those cars must be moved three car-lengths before they would clear track 30. Had these cars been kicked at a speed of ten miles per hour at that time they would have passed to track 29, and struck the two cars in about thirty seconds. Should these be moved three car-lenghts by the blow, the movement would be a success. Otherwise, the engine must come down to clear track 30.

While this movement was in progress, and its progress was short, the boy had finished his work on track 33, and was making his way on foot to pass to the south side of track 29, where his next work lay. There is no evidence whatever to show that one step of his way was in sight of the southeast corner of the yard, where the drag which included these three cars came into the yard, or of the lead over which they must come to be shunted to track 29. Plaintiff tells us, and we can see no reason to doubt the simple story, that he proceeded from the cars of stock which he had checked on track 33 across tracks 32, 31 and 30 to the rear end of the anchored car on 29, and was ten feet to the rear of the two cars, when he suddenly heard the terrific noise of a collision such as most of us who have been used to the clamor of a switching yard have heard many times, and the car struck him, and when he became conscious of his surroundings, he was lying at the side of and parallel with the track in the position to which he had, no doubt, struggled. The impact was, of course, violent. Eight heavy draw-bars immediately came together. Their powerful springs were

compressed and with their recoil the anchored car
plunged forward "just like a shot out of a gun." He
"did not know anything about it" and the car was on
him, producing the injury.

Upon learning of the accident the defendant com-
pany sent Mr. Barnwell, their car inspector, with Mr.
Dixon, their safety appliance man, to the place to inspect
the car. They found the brakes and draw-bars in perfect
order, and some blood upon the rail at the east end of
the west car, indicating that it had, after striking plain-
tiff, run at least its length, fifty feet, before stopping.
Plaintiff's statement that he was ten feet behind the car
when it moved, increased the distance to sixty feet, and
no one can tell, not even himself, how far he was thrown
or stumbled or struggled before he went outside the rail
upon which his leg finally rested under the wheels. The
defendant company had that testimony in its own keep-
ing. It saw where the car stopped, and knew where they
stood before they were struck by the cars thrown against
them. The testimony shows that from the switch con-
necting tracks 29 and 30 west to the clearance point be-
tween those tracks was about one hundred and ten feet,
which we may assume was the point where the east end
of these two cars stood, and the jury had the right to
infer from the evidence that the object of the force em-
ployed to kick the three cars down the track was to move
the two so far as to give room for the three to sit in the
clear. Whether it succeeded or not is not disclosed, but
the evidence tends to show, and the jury had the right
to find, that it was not only a dangerous but an unusual
blow, even in the operation of that yard, as described by
the witness Johnson in his testimony for defendant, to
which we have already referred.

That the sound of the bell upon the engine, had it
been rung, would have been heard by the plaintiff, and
given him ample opportunity to save himself from the in-
jury may be assumed. The defendant introduced testi-
mony tending to prove that it was customary to kick

cars onto these transfer tracks at all speeds up to ten miles per hour, at all times, without any warning whatever, and contends that such being the custom the plaintiff was required to take notice and to protect himself against it, however dangerous it might be. On the other hand, the plaintiff testifies that during his thirteen months of experience in the yard he had never seen or known of so violent a movement, that he had been told by his chief that he should not pass the rear of cars standing on those tracks closer than ten feet, that in taking that precaution he would be perfectly safe, and that he would be warned by the engine bell when cars were to be kicked down the incline. If these statements were made by the defendant company through its chief yard clerk they fixed a standard of careful management upon which the plaintiff could rightfully rely, and it was negligence to disregard, without notice, the standard so fixed, before his injury.

The defendant company seems to place its defense upon the ground that the jury were required, as a matter of law, to believe the stories of employees who testified to the customary violence displayed in the handling of these movements, and to disbelieve the reasonable story of the plaintiff to the contrary.

The more carefully we examine this testimony and the excellent map of the Kaw Bridge Yard which accompanies and forms a part of it, the more plainly it appears to our mind that the instructions which the defendant railroad company gave to this plaintiff through Mr. Sullivan, his chief, included the statement that he would be warned by the bell of the switch engine when it was about to kick cars down the incline into these storage tracks, that such warning was a necessary and reasonable precaution, and that had it been given in this case the accident would not have occurred. We also think that the evidence tends strongly to prove that the movement of the three cars against the two cars standing on track number 29 was in its force and rapidity of movement

dangerous and unusual, even in that particular yard, and was therefore negligent with respect to this plaintiff, and the jury had the right in the performance of their duty as triers of the facts to so find.

In the fourth instruction given for defendant the court told the jury, in substance, that the defendant owed to plaintiff no duty to warn him by ringing the engine bell of its intention to kick the cars down the incline. This left for the jury the question of negligence with respect to the use of unusual, unnecessary, extraordinary and dangerous force and violence as constituting the elements of negligence for their consideration, and upon these charges they found for the plaintiff and returned their verdict accordingly. That this verdict was well supported by the evidence we have already stated.

III. The appellant contends that plaintiff's instruction number one given by the court was erroneous, as it submitted to the jury an element of negligence which there was no evidence to sustain. This is founded upon the theory that there was no evidence tending to show that the plaintiff was not familiar with the ordinary duties and dangers of his employment. That the evidence tends to show that defendant was negligent in making the movement which resulted in the injury to plaintiff, we have held in the preceding paragraph, but the defendant contends that in requiring the jury, before it could find for the plaintiff, to further find that by reason of his youth and inexperience he was unacquainted with, and was not warned of the dangers of the situation, the instruction was rendered erroneous. The appellants freely admit that in suits founded upon common-law negligence, where contributory negligence constitutes an absolute defense, the rule has been well settled that this constitutes no error, but ingenuously argue that under the Employer's Liability Act, which requires the apportionment of the liability in proportion to the negligence of the respective

*Contributory Negligence.*

parties causing the injury, it is the number of the elements of negligence which must determine the amount apportioned to each rather than the importance of those elements. The argument necessarily assumes that the mere knowledge of the danger to which the work subjected him would constitute contributory negligence in the plaintiff. Contributory negligence, whether under the common law or the Federal statute, is a defense, in whole or in part as the case may be, and the railroad company had its opportunity to present it to the trial court upon appropriate instruction. This point is ruled for respondent.

IV. The sixth instruction asked by the defendant railroad company was properly refused. It was a mere attempt to impress the jury that the Federal Government, being primarily liable to respondent upon any verdict they might render, was entitled to more consideration in their deliberation than would be the railroad company were it the interested party. There is no such distinction. Both defendants alike were entitled to a fair and impartial trial.

Liability of Government.

V. Error is assigned by appellants upon the refusal of the court to give their instruction number five, which told the jury that "if you find and believe that the plaintiff while on either track 31 or 30 had an unobstructed view to the east and could, by looking, have seen the cars alleged to have been kicked onto track 29 as they approach said track, then it was the duty of the plaintiff not to attempt to cross track 29 in the face of said approaching cars." This instruction, as we have already said, in substance, in the second paragraph of this opinion, has no foundation whatever in the evidence. It is founded upon the photograph introduced in evidence, and the testimony of the photographer who took it, that had any one stood upon track 31 at the place where his camera stood,

Unobstructed View: Looking.

he would have had a plain view along the track over which the three cars came to the yard office, except so far as this view might have been interrupted by the viaduct. It is sufficient to say, as we have already said, that there is no evidence tending to show that plaintiff ever occupied that position or crossed track 31 at that point, while he states in his testimony that he did both look and listen at the point where he actually crossed it and neither saw nor heard approaching cars. The stock cars on track 33 from which he came might have been at any point on that track within three hundred feet west of the camera, and were only twenty-eight feet north of it.

VI. Among the points presented by defendants' statements in accordance with the rule of this court is the following: "The defendants were denied a fair and impartial trial before the jury, both on account of the improper conduct of plaintiff's counsel and the at-

**Argument to Jury.**

titude of the trial court," and during the course of its printed argument presents the following specifications from the argument of plaintiff's counsel: (1) "The mother sat here and told you that she was the mother of this boy; that the father had rheumatism and had been unable to work, and the boy, *the bread winner,* down there working in the sweat of his face—of course he wanted more money." (2) "And you say, 'Oh, Mr. Johnston has been a client of mine.' *Yes; they hurt poor Johnston and had to pay him.*" (3) "Let's don't pull that sort of stuff under the noses of the court and jury." (4) "If your verdict in this case is for $30,000, as I think it should be, *there will never be another child down there in those railroad yards* or in any other railroad yards owned by this company."

There is nothing in the points and authorities in defendants' brief, indicating the action of the court with respect to these matters, or the manner in which the points were made and saved at the trial, but out of cau-

294 Mo.—37

tion we have read the arguments of counsel and objections of defendants to the above remarks, and the action of the court thereon, which was at all times dignified, considerate and generally in accordance with the requests of the defendants.

Defendants' counsel in the cross-examination of witnesses elicited testimony showing that two of them who had been its employees had suits pending against it. This was properly brought out, as the jury should know the relations existing between the witness and the party for or against whom he testifies. That in these suits the defendant was charged with personal injuries for which damages were asked and that the witnesses were or had been represented by the same attorneys who appeared in this case for plaintiff was also shown. It may be that this matter also was pertinent to the degree of credit to be given their statements, but it would be unreasonable to say that this or any other evidence properly presented for the consideration of the jury should be too sacred in its character to be subjected to legitimate comment by counsel.

In the cases complained of the matters objected to in the remarks of plaintiff's counsel were at the suggestion of defendants' counsel definitely and distinctly withdrawn from the consideration of the jury. No further remedy in that respect was asked, and it is unnecessary that we should encumber the record with any further discussion of their propriety or impropriety.

VII. The appellants insist that the verdict is excessive. The injury, so far as tangible and definite, consists in the loss of a leg four and three-fourths inches below the knee. At the time of the trial neurosis was exhibited in the performance of the functions of the bladder, and there was much soreness in the part from which the limb was severed, which made it necessary that the limb should, as much as possible, be relieved from the pressure incident to using an artificial limb. The cause was tried

**Excessive Verdict.**

about sixteen months after the injury and we think that the evidence as well as general knowledge with reference to such matters justifies the conclusion that such conditions were, at that time natural, and did not indicate unusual delay in recovery.

In deference to the well-established practice of this court the judgment ought not to be permitted to stand for a greater amount than $10,000. [Kibble v. Railroad Co., 227 S. W. 1. c. 46; Newcomb v. Railroad, 182 Mo. 1. c. 726; Farrar v. Railroad, 249 Mo. 1. c. 227; Kinney v. Railway, 261 Mo. 97; Brady v. Railroad, 206 Mo. 509; Applegate v. Railroad, 252 Mo. 173.]

We therefore hold that if the plaintiff will, within thirty days from this date, enter in the trial court a *remittitur* of $10,000 as of the date of the judgment of said court, the judgment for the sum of $10,000 and costs will be and is hereby affirmed, as against Walter D. Hines as Director General of Railroads, alone; otherwise, it will be and is reversed and remanded for further proceedings in said trial court in accordance with this opinion. *Small, C.,* concurs in the result as to Paragraph One, and concurs in all other paragraphs; *Ragland, C.,* concurs in Paragraph One as to the result only.

PER CURIAM:—The foregoing opinion by BROWN, C., is adopted as the opinion of the court. *Woodson, P. J.,* concurs; *James T. Blair, Graves,* and *Elder, JJ.,* concur in result.