CHESTER MELVIN WILLIS v. ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, Appellant.—No. 38685.—178 S. W. (2d) 341.

Division One, February 8, 1944.

Rehearing Denied, March 6, 1944.

*Cyrus Crane, John H. Lathrop, James F. Walsh* and *Sam D. Parker* for appellant.

·*Raymond E. Martin* and *Trusty & Pugh* for respondent.

DALTON, C.—Action for damages for personal injuries sustained on account of the alleged negligence (res ipsa loquitur) of the defendant, when a freight car loading device with an automobile thereon fell upon plaintiff while he was assisting his employer (the consignee) unload a carload of automobiles at defendant's unloading dock in Chanute, Kansas. The cause was submitted upon specific negligence, to wit, negligent inspection and maintenance of the loading device and plaintiff obtained a verdict for $15,000. The trial court,

494

on motion for new trial, required a remittitur of $3000, and judgment was entered for $12,000. Defendant has appealed.

Appellant complains of the refusal of its demurrer to the evidence, of the giving of an instruction, of the admission of evidence, of counsel's argument to the jury, and of an alleged excessive verdict.

Stated most favorably to plaintiff, the evidence tended to show that on December 17, 1940, defendant (terminal carrier) notified plaintiff's employer (the consignee) of the arrival of a sealed Wabash freight car containing four Pontiac automobiles shipped from Pontiac, Michigan. When the car had been "spotted" for unloading, one Brazil, a member of the consignee firm, and two employees, plaintiff and Cox, went to defendant's freight office where Brazil signed a "ticket" on the shipment and got the "freight bill." Defendant's cashier and chief clerk sent one Busby, a general freight clerk, to accompany them to the freight car. Brazil broke the seal on the car and all four opened the doors and entered. The car was equipped with two Evans automobile loaders and the automobiles at each end of the car were in an elevated position, setting at an angle, facing each other and resting upon the respective loaders. The other two automobiles, facing in opposite directions, rested on the floor of the freight car, with the front part of each automobile extending under an automobile on a loader.

Each loading device consisted of a steel frame or rack to which the frame of an automobile was attached by chains. The rack (when loaded and elevated) was supported by two short metal legs at the back and two longer legs near the front. These four legs when in use were also attached to the floor of the freight car. The rack was further connected by four arms or levers extending to the top of the freight car. They tended to support the rack and to move it to the floor near the center of the car when the rack was lowered. The mechanism for raising and lowering the rack was attached to the top of the car, near the end, and consisted of an endless sprocket chain to which force was applied in operating the hoisting device. The chain passed over a sprocket wheel and the shaft supporting this wheel was connected by a worm gear with another shaft on which were mounted two drums. Cables from the drums extended over pulleys in the top of the car and down to the rack upon which the automobile rested. The worm gear, consisted of a bronze gear wheel and a spiral or worm properly meshed and enclosed in a housing so that a pull on the chain transmitted power to the drums to elevate or lower the rack supporting ▮ the automobile. In this manner the rack could be raised and the legs detached from the floor and folded up so the rack could be lowered and the automobile unloaded. When empty, the rack could be raised and fastened in the top of the freight car. The device was designed for operation by one man and the ratio of power transmission was such that, when in good

shape, the device worked smoothly and easily and a long pull on the chain moved the rack only slightly. Each loader weighed about 1500 pounds and the automobiles about 3400 pounds each.

Busby, in accordance with the established custom of defendant, had a pad and pencil and it was his duty to get the necessary information to fill out two forms furnished by the defendant. One was entitled "Report of Loss or damage to automobiles" with the words "use this form at time of inspection" and contained blanks for showing "unloading record," "inspection record" and "condition of mechanical loading equipment: (A) If ,car arrived with all permanent equipment properly fastened, so state . . . (B) Describe any defects found with racks, deck legs, sway hooks, holddown chains, hoist or improper fastening thereof . . . " The other form was entitled "Railroad Freight Damage Inspection Report and Claim" and contained blanks for showing description of the shipment, list of damaged parts, apparent cause for damage and "general condition of equipment (loading device)." Busby regularly filled in and signed the first form over the words "Railroad Inspector" and the second form over the words "Signature of inspector for railroad." Busby, testifying for defendant, admitted that he regularly made inspection of damages on all commodities, whether of carload lots or less, consigned to Chanute; that he was directed by his superior to inspect the carload of automobiles in question; that he customarily was present at all times when automobiles were being unloaded from freight cars, unless called away; and that, in the use of the blank forms, he filled in the blank concerning the "condition of mechanical loading equipment" to the best of his knowledge and ability, but only when something was evident by observation. There was testimony that the consignee was never permitted to open a freight car, without a representative of defendant being present, or to proceed with the unloading of automobiles, until such representative had gone over the car, equipment and contents and secured the necessary information to fill out these forms.

On this occasion Busby, in the course of his work, went to the north end of the freight car with his book and pencil and twice to the south end of the car and he made some memorandum. He observed that the chains which had held the automobile on the north loader were broken and that the automobile rested against the end of the freight car. The broken chains hung down and had scratched the automobile beneath and both automobiles were damaged. He observed that the sprocket chain in the south end of the car was out of the slot (used to prevent the chain from swinging). He did not try to operate either loader. Brazil, Cox and plaintiff waited as usual for Busby "to go over the boxcar and equipment and automobiles." Busby then told Brazil to proceed to unload the automobiles. The two automobiles on the floor of the freight car were first removed. In so doing it

was necessary to remove the front legs from under the north and south loaders. Several years before, when freight cars were first equipped with such loaders, one of defendant's employees from the freight house had shown Brazil how to operate the loaders and to get the automobiles out of the freight car. When Brazil went to raise the south loader, so that the front legs of that loader could be moved out of the way, he had to pull hard on the chain. He couldn't move it very far at a time. The mechanism didn't operate smoothly and evenly, but in jerks and jumps.

Busby assisted in lowering the automobile on the north loader. It was wedged against the end of the car and had to be pried out so that it would go down as the rack was lowered. When this automobile had been removed from the car, Brazil attempted to raise the south loader rack further so that its back legs could be released and folded, but he could not do so and Cox assisted him, both pulled hard on the chain to raise the rack even slightly, and it jerked a little. After the legs were out of the way, Cox started to pull the chain to lower the rack, while Brazil, Busby and plaintiff stood near the center of the freight car. Ordinarily the loader rack would have descended very slowly, but on this occasion (after a 3 inch pull on the chain) it fell, swung forward and pinned Brazil and plaintiff underneath, injuring them. The automobile was damaged by the fall and Busby reported the damages on it and on the other two automobiles for adjustment by defendant.

Brazil and Cox had previously assisted in unloading 40 to 50 cars of automobiles, but this was plaintiff's first experience, although he had been present when one other car was unloaded. On certain occasions Brazil and Cox had found loaders hard to operate, but such fact meant nothing to them, and none had been as hard to operate as this one. After plaintiff was injured, the worm gear housing of the south loader was removed. The spindle of the worm had been completely fractured and showed rust discoloration for 70% of the break. The threads of the spiral or worm were badly broken, with parts of the spiral gone. At one place the teeth of the gear wheel could pass (become disengaged) and spin without turning the spindle or shaft of the worm. The teeth of the gear wheel and the threads of the spiral worm gear showed long and excessive wear, with deep scratches and mutilation from heavy pressure and failure to properly mesh. One-third of the metal was worn off the face of the spiral.

There was further evidence tending to show that the way to inspect such a loading device was to pull on the hoisting chain, so as to raise or lower the rack, and to tell by the feel of the manner of operation whether the hoisting mechanism was in good condition. If it was in good shape it could be operated easily and smoothly by one man. Working hard would indicate, to one familiar with the device, that something was wrong and, if the operation was rough and irregular,

that something was radically wrong inside the housing. The device could be tested without dismantling, but difficulty in operation would mean nothing to a layman. Other facts will be stated in the course of the opinion.

Appellant contends there was no evidence to show negligence because (1) there was no duty to inspect the loading device inside the sealed freight car, either before or after delivery to the consignee; (2) the defect, if any, was not discoverable by a reasonable inspection; and (3) if any defect existed and was discoverable by a resonable inspection, the consignee discovered it before plaintiff was injured and there was no duty on defendant to warn plaintiff. Appellant says its duty, as a delivering carrier, was limited to outside inspection and that it could not make an inside inspection, because it had no right to break the seal and enter the car for that purpose. It insists that, since its evidence showed that such outside inspection had been made on receipt of the sealed car, and that the car had been selected by the Grand Trunk Railroad (initial carrier) and the car and loaders had been inspected by experienced inspectors of the Wabash and Grand Trunk Railroads (with one inspection immediately before loading and sealing) and no defects had been discovered in the loaders after operational tests, the defendant had discharged its full duty to plaintiff as a matter of law.

Appellant, by the cases cited and relied upon, concedes the general rule to be that it is the duty of a carrier, before delivering a car to a consignee whose employees are to enter it and unload it, to exercise due care to examine the car and ascertain whether it is in such state of repair that the consignee's employees, while exercising ordinary care themselves, may enter it for the purposes intended; and if the car is found not to be in such condition that the consignee's employees may enter it with reasonable safety, then it becomes the duty of the carrier to make the necessary repairs, or else to advise the consignee of the car's unsafe condition so that the consignee may warn its employees of the danger to be encountered before they enter it. Sykes v. St. Louis & S. F. R. Co., 178 Mo. 693, 77 S. W. 723; Ward v. Kurn (Mo. App.), 165 S. W. (2d) 290, 293; Doering v. St. Louis & O'Fallon R. Co. (Mo. App.), 63 S. W. (2d) 450; Copeland v. Chicago, B. & Q. R. Co., 293 Fed. 12, 15. See, also, Markley v. Kansas City Southern R. Co., 338 Mo. 436, 90 S. W. (2d) 409, 411, and cases cited.

Appellant says it is not an insurer of the safety of its cars and may not be held liable for injuries resulting from defects which it either had no opportunity to discover, or which a reasonably careful inspection would not have revealed. Appellant concedes that plaintiff was injured by the failure of the loading device ("the failure of the gears inside the gear housing"), but it relies on cases where terminal carriers have delivered loaded freight cars to consignees and

the consignees or their employees, in the absence of the carrier's representatives, have been injured by defects, latent or otherwise, inside the loaded cars, and where the defects were not only unknown to the delivering carriers, but no reasonable inspection of the cars from the outside, after they had been loaded and sealed, would have shown or suggested that the defects existed. Copeland v. Chicago, B. & Q. R. Co., supra; Ward v. Kurn, supra; Martin v. So. Pacific Co., 46 Fed. Supp. 954 and 957; Pass v. Gulf, C. & S. F. R. Co. (Ct. of Civ. Apps. of Texas), 83 S. W. (2d) 729; Kansas City, M. & O. R. of Texas v. Pysher (Ct. of Civ. Apps. of Texas), 195 S. W. 981. These cases are not applicable under the particular facts of this case, since it appears here (from the evidence of both parties) that the freight car was not unqualifiedly released to the consignee, but appellant sent an inspector to be present when the car seals were broken, so that he could make an inspection of contents, equipment and causes of damage, if any. While it appears that such inspection of contents and equipment was primarily for the benefit of the carrier in its relation to the automobiles consigned, it cannot be said as a matter of law that it had no reasonable opportunity to discover the defective condition of this loader, or that it owed no duty to plaintiff to make a reasonable inspection of the loader. In this case two of the automobiles were elevated on loaders. The hoist mechanism was provided for use in lowering the automobiles to the floor of the freight car. The consignee or his employees was required to use the hoist mechanism to get the automobiles from the freight car and if it was out of repair it was highly dangerous to use. Appellant had knowledge of these facts. In this instance appellant had a representative present, who assisted in opening the car door and proceeded to make such inspection of the inside of the car, its contents and equipment as he desired to make. The consignee's employees, in accordance with the established practice, did not start unloading until they were told to proceed. The direction to proceed with the unloading was at least some assurance that it was reasonably safe to do so and defendant, having assumed the duty of inspection, was bound to use such methods of inspection as were reasonable to discover defects. The evidence tends to show that neither respondent nor his employers knew anything about the hoist mechanism or methods of testing the device for defects. Whether or not appellant made a reasonable inspection of the car and loading device in view of the particular facts and circumstances observed and existing when the freight car was opened, whether or not any test by operation of the device was reasonably required under the particular circumstances, and whether, if by making such an inspection or test, appellant could reasonably have discovered the condition or defect in the loader, which caused the rack to fall, were properly for the jury. It is immaterial that the gears themselves were not visible (without removal of the housing)

since the evidence was such that a jury could find that the defect was discoverable by a reasonable inspection. The demurrer to the evidence was properly refused.

■ Did plaintiff's instruction 1 submit an issue outside the scope of the issues raised by the pleadings? The petition charged general negligence under the res ipsa loquitur doctrine, to wit, that "the sudden giving way and dropping of said platform with said automobile thereon . . . would not have happened but for the negligence of defendant." Instruction 1 required the jury to find "that by the exercise of . . . ordinary care in a reasonable effort of inspection or test . . . the defendant could or should have ascertained or discovered that said appliance was not in a reasonably safe condition for . . . use . . . and . . . that defendant failed to exercise such ordinary care in a reasonable effort to so discover or ascertain said condition and failed to use such ordinary care to have said device in a reasonably safe condition for said work of so unloading said automobile . . ." The evidence upon which the instruction was based was not objected to as being beyond the issues made by the pleadings and no request to amend the pleadings was made. Appellant says that the instruction submits an issue foreign to the issues raised by the pleadings.

If the instruction submits a specific charge of negligence, independent of the cause of action founded upon the abnormal movement of the rack, as pleaded under the doctrine of res ipsa loquitur, the instruction is erroneous. Kitchen v. Schlueter Mfg. Co., 323 Mo. 1179, 20 S. W. (2d) 676, 683. But we think the specific issue submitted by instruction 1, was within the scope of the general charge of negligence as set forth in the petition. The character of the happening and the attendant circumstances, as alleged, were such that some negligence of defendant in respect to the construction, care (inspection) and maintenance of the instrumentality could be inferred. The specific negligence submitted was, therefore, within the scope of that kind of negligence which could be inferred from the unusual occurrence and its attendant circumstances as shown in evidence. See, Scheurer v. Banner Rubber Co., ■ 227 Mo. 347, 366, 126 S. W. 1037; Ash v. Woodard & Tiernan Printing Co., (Mo. Sup.), 199 S. W. 994, 999; Meade v. Missouri Water & Steam Supply Co., 318 Mo. 350, 300 S. W. 515, 517; Eckhardt v. Wagner Electric Mfg. Co., (Mo. Sup.), 235 S. W. 117; Gordon v. Muehling Packing Co., 328 Mo. 123, 40 S. W. (2d) 693, 697.

■ Concerning the admission of evidence, the testimony of Brazil tended to show that, when freight cars equipped with Evans loaders first arrived in 1935 or 1936, a Santa Fe man was sent from the freight house to show him how to unhook the tiedown chains on the automobiles, how to raise and lower the lift and in what order and how to get the automobiles out of the freight car. He was further told

that after the automobiles were out of the car "the lift should be pulled back up to the top"; and that that was all he (Brazil) was supposed to do. No other instruction was given concerning the construction of the equipment or how it operated. After the above evidence was in the record without objection, the witness was recalled and permitted to testify that, on this first occasion, the Santa Fe man said "they would take care of the equipment." The witness was further permitted to testify that on this, and all other occasions, he was "told to wait" for the Santa Fe representative to go over the boxcar, equipment and automobiles. Appellant then and now insists that the above evidence was hearsay, highly prejudicial, and not binding on defendant because the scope of the agent's authority was not shown. Respondent says the testimony objected to was a mere restatement of evidence that came in the record without objection and this, to some extent, is true. However, in view of the subsequent testimony of defendant's witness, Busby, concerning his activities and duties during a three year period, and the obligation imposed by law under the facts, we are unable to see how defendant could have been prejudiced by the testimony objected to. The assignment is overruled.

■ Did the court err in refusing to declare a mistrial on account of the argument of plaintiff's counsel? The record shows that plaintiff's counsel stated: "They proved by the inspector . . . that there was no outside damage that would be sufficient to tear these two big chains loose, but they didn't prove that in moving it (the car) from that point to where they spotted it that such violence did not take place." Objection was made that the argument was not within the issues in the case and that "there was no allegation of rough handling." Counsel asked the court to declare a mistrial. The court said the jury could take into consideration all evidence bearing upon the ultimate facts and issues in the case. Counsel saved exceptions and the court then said: "I agree with you that there is no specific ground of recovery on that." Plaintiff's counsel also stated: "That is right. Recovery is not based on that." No further requests for relief or objections were made. The matter of granting a mistrial for improper argument rests largely within the discretion of the trial court and we think the record in this case fails to show an abuse of the court's discretion in ruling appellant's request. Rouchene v. Gamble Const. Co., 338 Mo. 123, 89 S. W. (2d) 58, 65. The assignment is overruled.

■ Appellant contends that the court "erred in overruling defendant's motion for a new trial for the reason that the verdict of the jury is excessive and is the result of passion and prejudice," which the remittitur "does not and cannot eradicate."

Plaintiff was about 27 years of age at the time of receiving his injuries. The femur of his left leg was completely fractured 7 or 8

inches above the knee. The right leg was injured, but healed leaving a couple of scars. Plaintiff suffered from bruises and shock and from swelling and inflammation in his left leg. It was impossible to set the fracture without an operation, and it became necessary to make an open incision down to the bone for some 10 or 12 inches above the knee. An inarticular bone splint was inserted inside the hollow part of the femur to hold the broken ends of the bone in place. Plaintiff was placed in a cast extending from the middle of his waist down to the toes of his left foot. He was in a cast for some two months and was in the hospital nine and one-half weeks. While he was in the hospital two running sores developed which did not heal for a month after he left the hospital. Plaintiff had to take diathermy treatments for about two months.

The broken leg bone is now straight and well healed with lots of callus, but there was some atrophy or wasting away of the muscles of the left thigh, which is now one inch smaller in circumference than the right thigh and the leg is weaker. When the cast was removed the left knee was anklylosed to a great extent and ultimately there was a permanent loss of 60 per cent of the flexion in the knee. For about ten months after the cast was removed, efforts were made to increase the flexion by force in order to break up adhesions in the knee. Sometimes an anesthetic was used and sometimes not. The ligaments around the knee had become thickened and there was a deposit of calcium which interfered with movement. Because of the limited motion in the knee, plaintiff has to walk to a certain extent like a man with a wooden leg and there is much greater opportunity for injury than there would be normally. In going up a ladder or stairs he has to move one leg up and then drag the other up afterwards. He has difficulty in getting downstairs since he cannot walk like a normal person and there are certain things that he cannot do. The left leg is, perhaps, a half inch shorter than the right, but the shortening is practically inperceptible. Plaintiff was treated by his physician off and on for a year or more and suffered pain for a year and a half. If he is on his leg constantly over a period of hours, it aches and pains above the knee. Prior to his employment by the Brazil Motor Company, plaintiff was a gauger and pumper for the Petroleum Products Company at 50 cents per hour, six hours per day, seven days per week with some overtime. He went back to work for this company, after a ten months period, at 45 cents per hour, while the regular wage was 50 cents per hour. When wages advanced to 55 cents per hour, he received 50 cents per hour.

There is no accurate scale for measuring the money value of the damages sustained by plaintiff on account of his injuries and an excessive verdict does not necessarily show passion and prejudice. Each case must be considered upon its own peculiar facts. Considering the verdict of $15,000 in the light of a most favorable view

of the evidence as to injuries and comparing it with other verdicts which have been permitted to stand in cases of similar injuries, we think the verdict was excessive. The trial court wisely ordered a remittitur, but we think the amount still excessive. O'Brien v. Vandalia Bus Lines, 351 Mo. 500, 173 S. W. (2d) 76, 78. Appellant calls particular attention to a number of decisions indicating that this court has considered $10,000 to be ample and reasonable for the entire loss or amputation of a leg. Brucker v. Gambaro (Mo. Sup.), 9 S. W. (2d) 918; Powell v. Kansas City Rys. Co. (Mo. Sup.), 226 S. W. 916; Spencer v. Quincy, O. & K. C. Ry. Co., 317 Mo. 492, 297 S. W. 353; Fitzsimmons v. Missouri Pacific R. Co., 294 Mo. 551, 242 S. W. 915; Morris v. Atlas Portland Cement Co., 323 Mo. 307, 19 S. W. (2d) 865, 878. The above cases were decided in the twenties and respondent suggests that times have changed. Where the trial court has considered and passed upon the matter and has ordered a substantial reduction, we are usually reluctant to order a further reduction. Gieseking v. Litchfield & Madison Ry. Co., 344 Mo. 672, 686, 127 S. W. (2d) 700. However, in this case a further reduction is required. If plaintiff will remit $2000 within ten days the judgment will stand affirmed for $10,000 as of the date it was originally entered; otherwise the judgment will stand reversed and the cause be remanded for a new trial. *Bradley* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.