Thomas PARLOW, (Plaintiff) Respondent,

v.

CARSON–UNION–MAY–STERN COMPANY, a Corporation, (Defendant) Appellant.

No. 46119.

Supreme Court of Missouri, Division No. 1.

March 10, 1958.

Evans & Dixon, John F. Evans, St. Louis, for appellant.

Paul Dixon and Cleo V. Barnhart, St. Louis, for respondent.

DALTON, Judge.

Action for damages for personal injuries. Plaintiff, an employee of an independent contractor, was doing work for defendant upon a sectional metal scaffold furnished by defendant. The scaffold fell over on its side and plaintiff was injured. The cause was submitted under the res ipsa loquitur doctrine and a verdict returned for plaintiff for $50,000. Defendant's motion for a new trial was overruled after plaintiff entered a remittitur for $15,000. Final judgment was entered for plaintiff for $35,000. Defendant has appealed and contends that the court erred in refusing to direct a verdict for defendant.

Plaintiff's own testimony was the only evidence on the issue of liability. It tended to show that plaintiff was a boiler maker by trade but, on December 7, 1954, was employed as a glazer by the American Plate Glass Company in the City of St. Louis. On the date mentioned, plaintiff was directed to go to defendant's store at 12th and Olive streets for the purpose of removing some broken glass and making repairs to the store canopy which extended over the sidewalk on 12th street. His boss informed him that defendant would furnish a scaffold for his use. He reported to the store, as directed, and was referred to the porter or maintenance man, who would get the scaffold, which was a sectional one made of aluminum piping. At that time, it was disassembled in defendant's shipping room. Plaintiff helped the porter carry the various pieces of the scaffold to the sidewalk in front of the employees' entrance to defendant's store, but plaintiff advised the porter that, under union rules, he was not permitted to put up a scaffold for his own use. Plaintiff, however, did assist the porter by holding the various sections, or by handing the pieces to the porter as the scaffold was being assembled and the pieces fitted together. Plaintiff was facing the porter while the scaffold was being erected, but did not observe the manner in which the scaffold was assembled, since he assumed the porter knew what he was doing.

The scaffold consisted of four separate end sections, each consisting of two vertical or upright tubular pipes joined together by crossbars. The two upper end sections were fitted into the tubular piping of the lower sections so that the entire end sections of the scaffold, when assembled, were approximately 12 feet in height. When the end sections were assembled into two units, they were joined together by means of tubular criss-cross bars which were fitted onto the cross sections of the end pieces by means of snap flanges. On the top crossbars of the upper end sections there was another crossbar which joined the two end sections together. After the various pieces of piping were assembled, a removable platform was placed in position. It was made of plywood and supported by tubular piping which fitted from end to end of the scaffold by means of flanges resting on the end crossbars. This platform could be raised or

lowered so as to rest at the level of any of the several crossbars. The entire scaffold was supported on four small wheels, the mountings of which fitted into the lower ends of the piping forming the upright end sections.

Plaintiff was familiar with and had used various types of scaffolding and had used sectional metal scaffolding, although he had never used a scaffold like this one, or one resting on wheels. After the scaffold was completely assembled (except for fitting the wheels on the legs) plaintiff went inside the store to obtain his tool box and also to obtain a cardboard carton in which to place the broken glass. When he returned to the sidewalk he found that the porter had moved the scaffold to a position underneath and slightly to the outside of the canopy. The porter informed him that the scaffold was ready for use and he could go ahead and use it. The sidewalk where the scaffold was placed sloped slightly toward the street. Plaintiff did not know whether the porter, after placing the scaffold in position, made any adjustments in the leg leveling devices or whether he locked the wheels on the scaffold. Plaintiff relied upon the porter and did not feel or shake the scaffold to see if it was solid and safe. When he climbed up on the scaffold it did not roll or move from its footing but, as he worked, he noticed that there was a sort of wobble or sway with the movements of his body. This was common to all scaffolds and did not concern him particularly.

Plaintiff proceeded with the removal of broken glass for a period of approximately 20 minutes until he had partially filled the cardboard carton. He then climbed down with the box of broken glass and went into the store to get another box. He was in the store two to five minutes and then returned to the scaffold and climbed up on the platform and resumed his work. From the time the scaffold was first placed at the canopy until the plaintiff climbed upon the scaffold for the second time, plaintiff did not observe any of the store employees on the sidewalk or in the immediate vicinity of the scaffold.

As plaintiff was stooping over his tool box, facing 12th street, the scaffold suddenly without warning gave way, dropped downward two or three inches and fell over on its side toward the building, causing plaintiff to fall to the sidewalk. Plaintiff testified: "I stooped down to get some tools in order to take this lettering off, and I felt something give, something just went down, like that, and the next thing I knew, I was going over backwards. * * * It felt like (it dropped) two inches, two or three inches, something like that, and it started going back." This was different from this wobbly sensation he noticed when he first got on the scaffold. He did not know what part of the scaffold collapsed, or what caused him to fall.

Plaintiff landed on his heels and buttocks on the sidewalk with the scaffold lying across him, with its top toward the building. He felt "an awful pain" in his back and leg, but pushed the scaffold off and "hobbled" into the store, where he reported the occurrence, asked for help and sat down. He advised his employer that he had been injured and a driver was sent to take him to a doctor's office. Before leaving defendant's premises, plaintiff assisted an employee of the store to upright the scaffold. When uprighted, it still stood up. The platform on which plaintiff had been working was lying on the sidewalk. Plaintiff didn't pay any attention to the condition of the scaffold at that time because he was "in a terrific amount of pain." He couldn't say whether the wheels were still attached to the scaffold or not. So far as plaintiff was able to observe, the four crossbars were intact.

Appellant insists that the court should have directed a verdict for defendant, as requested, since there was no direct evidence of negligence on the part of defendant and the facts do not warrant the application of the res ipsa loquitur doctrine. Appellant contends (1) that the evidence shows the scaffold was not within the exclusive possession or control of defendant at the time plaintiff was injured;

(2) that the evidence fails to show that the defendant possessed superior knowledge or means of information as to the cause of the occurrence; (3) that the "occurrence" was not of such unusual or extraordinary character as to give rise to an inference of negligence under the res ipsa loquitur doctrine; and (4) that there was no proof the scaffold was defective or that any of its component parts became disconnected or broken and the real cause of the occurrence is a matter of speculation and conjecture.

The doctrine of res ipsa loquitur applies only "when (a) the occurrence resulting in injury was such as does not ordinarily happen if those in charge use due care; (b) the instrumentalities involved were under the management and control of the defendant; (c) and the defendant possesses superior knowledge or means of information as to the cause of the occurrence." McCloskey v. Koplar, 329 Mo. 527, 46 S.W.2d 557, 559, 92 A.L.R. 641. However, "the rule that the exclusive control and management of the appliance or thing causing the injury must be shown to have been in the defendant does not mean physical control, but refers to the right of such control * * *." Maxie v. Gulf, Mobile & Ohio R. Co., 356 Mo. 663, 202 S.W.2d 904, 911(5–6); Cruce v. Gulf Mobile & Ohio R. Co., 358 Mo. 589, 216 S.W.2d 78, 80; Cruce v. Gulf, Mobile & Ohio R. Co., 361 Mo. 1138, 238 S.W.2d 674, 677, 679(8); Cantley v. Missouri-Kansas-Texas R. Co., 353 Mo. 605, 183 S.W.2d 123, 130; McCloskey v. Koplar, supra, 46 S.W.2d 557, 560.

"A plaintiff to come within the doctrine need not show such a state of facts surrounding the accident as excludes every reasonable hypothesis except defendant's negligence. The attendant facts must raise a reasonable inference of defendant's negligence but they need not also exclude every other inference." Maxie v. Gulf, Mobile & Ohio R. Co., 358 Mo. 1100, 219 S.W.2d 322, 325(5), 10 A.L.R.2d 1273; Baugher

v. Gamble Const. Co., 324 Mo. 1233, 26 S.W.2d 946, 950; Warner v. Terminal R. Ass'n of St. Louis, 363 Mo. 1082, 257 S.W.2d 75, 79; Cantley v. Missouri-Kansas-Texas R. Co., supra, 183 S.W.2d 123, 127.

While plaintiff was the only witness who testified as to facts upon which the issue of liability is based and while a plaintiff is bound by his own personal testimony, nevertheless, in determining whether the facts and circumstances testified to by him call for the application of the res ipsa loquitur doctrine and whether a case was made for the jury, we must consider plaintiff's testimony as a whole, and as true, and view it in a light most favorable to plaintiff. When so viewed, the evidence is sufficient to make a submissible case for plaintiff under the res ipsa loquitur doctrine.

As stated, plaintiff was an employee of an independent contractor. He was sent to do repair work on defendant's building. The scaffold was owned and furnished by defendant and assembled by defendant's employee. While plaintiff assisted in carrying, holding or handing up pieces to be used in the construction of the scaffold, he did not participate in putting the parts together and did not observe the manner in which defendant's employee assembled the several parts. He assumed that defendant's employee knew what he was doing. Defendant's employee placed the scaffold in position for plaintiff's use and assured him it was ready for use and that he could proceed to use it. Plaintiff then proceeded to use the scaffold in the usual and normal manner, at the place where it had been stationed for its intended use. While standing on the platform of the scaffold and going about his work in the making of the repairs, the scaffold suddenly, without warning, dropped downward two or three inches and the whole scaffold fell over on its side and plaintiff fell and was injured. The facts and circumstances attending the overturning of the scaffold

were clearly shown. They were observed and testified to by plaintiff. On plaintiff's testimony, it fell over for no apparent cause. The fact that the platform dropped down a few inches and then the whole scaffold fell over on its side precipitating plaintiff to the sidewalk some 12 feet below was an unusual event of extraordinary character and one that does not ordinarily happen when scaffolds provided for workmen to use while making repairs to a building are properly constructed and maintained and those in charge use reasonable care. The event in question, to wit, the fact that the scaffold, under the circumstances shown, suddenly turned over on its side and dashed plaintiff to the sidewalk below, bespeaks negligence and defendant's superior knowledge thereof, since defendant owned, possessed and controlled the scaffold. It was furnished to plaintiff to facilitate the making of repairs to defendant's building. On plaintiff's evidence a jury could find that plaintiff exercised no possession, dominion, control or right of control by merely standing upon and using the scaffold under the circumstances shown. Clark v. Linwood Hotel, Inc., Mo.Sup., 291 S.W.2d 102, 105 (4); Allen v. St. Louis-San Francisco R. Co., (Mo.Sup., 297 S.W.2d 483, 487; Blanton v. Dold, 109 Mo. 64, 74, 18 S.W. 1149; Meade v. Missouri Water & Steam Supply Co., 318 Mo. 350, 300 S.W.2d 515; Gordon v. Muehling Packing Co., 328 Mo. 123, 40 S.W.2d 693. Plaintiff's use was in recognition of defendant's possession, ownership and exclusive right of control. There was no evidence tending to show that anyone had tampered with the scaffold in plaintiff's brief absence and the circumstances shown would indicate and support a reasonable conclusion that there was no opportunity for such interference, however, the mere possibility that some passer-by may have interfered with the scaffold in plaintiff's absence would not destroy the application of the res ipsa loquitur doctrine. Maxie v. Gulf, Mobile & Ohio R. Co., supra, 219 S.W.2d 322, 325(5); Bob-

bitt v. Salamander, 240 Mo.App. 902, 221 S.W.2d 971, 976. Nor was plaintiff required to introduce evidence reasonably excluding the hypothesis of a latent defect in the scaffold or any defect of so recent origin as to afford defendant no reasonable opportunity of discovery. Warner v. Terminal R. Ass'n of St. Louis, supra, 257 S.W.2d 75, 80.

■ It is true that there is no direct evidence showing exactly why the scaffold turned over, nor any showing of specific defects therein "or that any of its component parts became disconnected or broken." If specific negligence had been shown the res ipsa loquitur doctrine would not apply. Venditti v. St. Louis Public Serv. Co., 360 Mo. 42, 226 S.W.2d 599, 602. The facts and circumstances shown by plaintiff's evidence call for the application of the res ipsa loquitur doctrine and plaintiff made a case for the jury. On the record presented a jury could find that the defendant had and retained the exclusive possession and control and the right of control of the scaffold and an inference could be drawn that the scaffold must have fallen due to some defect in its maintenance or construction and because of the negligence of defendant. Baugher v. Gamble Const. Co., supra; McCloskey v. Koplar, supra.

Appellant cites Shafer v. Southwestern Bell Telephone Co., Mo.Sup., 295 S.W.2d 109, 113, (where there were no witnesses to the occurrence, which resulted in Shafer's death, and no proof of the attendant facts. Concerning the application of the res ipsa loquitur doctrine, the court said: " * * * the attendant facts must raise a reasonable inference of defendant's negligence. * * * The doctrine cannot be invoked where the existence of negligence is wholly a matter of conjecture and the circumstances from which negligence may be inferred are not proved but must themselves be presumed.") Gibbs v. General Motors Corp., 350 Mo. 431, 166 S.W.2d 575, 581, (where plaintiff

had purchased a new automobile from defendant and used it about two months and had driven it over 1500 miles when, while plaintiff was operating it, it swung to its left and collided with another automobile.) Maybach v. Falstaff Brewing Corp., 359 Mo. 446, 222 S.W.2d 87, 90, 92, (where a bottle exploded seven or eight days after it was out of defendant's possession and control. In that case the court said: "* * * respondent cannot rely upon the mere proof of the occurrence to raise an inference of negligence on the part of appellant, but must offer evidence to negative the possibility that the injury may have been due to some cause intervening after appellant had parted with control. Of course, respondent will be entitled to any reasonable inference arising from the nature of the explosion as well as from other testimony. In other words the case should be submitted, not as a true res ipsa loquitur case, but as one depending in part upon circumstantial evidence.") Charlton v. Lovelace, 351 Mo. 364, 173 S.W.2d 13, (where there was no testimony concerning the attendant facts and circumstances when defendant's boat turned over. Absent proof of the attendant facts and circumstances the court said that the mere fact that the boat turned over did not point to the negligence of defendant as its cause.) Venditti v. St. Louis Public Serv. Co., supra, 226 S.W.2d 599, 601, (where plaintiff's evidence pointed to the specific negligence of the defendant and the court said that where a plaintiff demonstrates by the evidence he adduces that he has access to and knows the specific negligence of defendant causing his injuries, the necessity giving rise to the public policy creating the exception does not exist.) Brown v. St. Louis County Gas Co., Mo.App., 131 S.W.2d 354, 359, (where "the mechanical devices by which the intake of gas was regulated belonged to plaintiff herself, were located on her own premises, and were at all times subject to her right of exclusive management and control, which right was not affected by the fact that she found it expedient and necessary to authorize one of defendant's employees to enter upon her premises for the purpose of making the particular adjustment.") Klebe v. Parker Distilling Co., 207 Mo. 480, 487, 493, 105 S.W. 1057, 1060, 13 L.R.A.,N.S., 140, and Sabol v. St. Louis Cooperage Co., 313 Mo. 527, 282 S.W. 425, 431, (cases where the servants had superior knowledge and opportunity to know of the defects in the machinery or appliances under their own control which caused the injuries.) Tayer v. York Ice Machinery Corp., 342 Mo. 912, 119 S.W.2d 240, 244, 246, 117 A.L.R. 1414, (an action in tort against the manufacturer of a chattel, where the defendant had no control or right of control over any instrumentality or actor to the occurrence relied upon). The cases relied upon by appellant are distinguishable upon their facts.

■ Appellant next assigns error on the giving of Instruction No. 2. Appellant insists that, since the evidence shows (apparently, as a matter of law) "that the scaffold was in the sole possession and custody of plaintiff at and prior to the occurrence, the instruction is both misleading and prejudicial, and virtually eliminated the element of exclusive management and control from the case." We think the court properly told the jury in Instruction No. 2 that in determining whether or not defendant had the exclusive management and control of the scaffold, as submitted in Instruction No. 1, the court did not mean "actual physical control, but refers to the right of control of said scaffold at all times mentioned in the evidence." See Maxie v. Gulf, Mobile & Ohio R. Co., supra; Cruce v. Gulf, Mobile & Ohio R. Co., supra, 216 S.W.2d 78; Cruce v. Gulf, Mobile & Ohio R. Co., supra, 238 S.W.2d 674; Cantley v. Missouri-Kansas-Texas R. Co., supra; McCloskey v. Koplar, supra.

■ Appellant further contends that the judgment, as entered for $35,000 after the $15,000 remittitur, is still grossly excessive, by at least $10,000, and an order

for a further remittitur is requested. In determining the extent of plaintiff's injuries we will review the evidence in a light favorable to plaintiff.

Plaintiff suffered injuries to his right foot and back. The injuries to his foot consisted of a fracture of the posterior aspect of the heel bone, the os calcis or weight bearing portion of the heel. The fracture has healed with some callus formation from the periosteum and there is some roughness there caused by this bony overgrowth in the articulating surfaces of the ankle joint. There is some spurring of the ankle end of the tibia evidencing hypertrophic arthritis due to trauma. This traumatic arthritis causes pain on use of the foot. The condition is further referred to as post-traumatic hypertrophic arthritis of the right ankle resulting from the traumatic fracture of the mentioned bone. There is considerable limitation of motion in the ankle and heel and tenderness with a thickening of the distal portion of the heel bone. Walking or climbing steps or ladders is accompanied by popping or creaking noises and painful sensations in the right ankle. The permanent functional disability of his right foot was rated at 35 percent.

The injury to plaintiff's back consisted of a rupture of an intervertebral disc in the lumbar spine in the space between the fifth lumbar and the first sacral segments, which injury ultimately required surgery for the removal of the disc so that, after corrective surgery, the plaintiff was left with a permanent functional disability to the spine of 25 percent as the result of this injury.

Plaintiff had suffered two previous back injuries. On March 10, 1950, he tripped and fell through the roof of a temporary storage shed, a fall of about 12 feet, and injured his entire back and an arm and leg. Six or seven months later he had completely recovered and there was no relapse. On December 8, 1952, he was struck and knocked down by a piece of boiler plate and sustained injuries to the lower part of his back. He was treated for these injuries over six or seven months and they were still bothering him when he was injured on December 7, 1954. The 1952 acute back injury was diagnosed as a lumbosacral sprain and it resulted in a permanent partial disability to the back of 10 to 15 percent. Plaintiff continued, at intervals, to have a grabbing pain in the center of his back, but it never radiated down into the legs prior to his last injury. After his fall with the scaffold, the pain was continuous and in a different location. The pain then was in his low back and left hip and down his left leg to the heel. Corrective surgery in August 1956 has relieved this pain, but he still suffers other disabilities such as stiffness in his back which won't let him move around freely.

Plaintiff described his condition prior to surgery as follows: "It got to the point where the pain kept getting more severe, where my whole left side was just practically like you would say paralyzed, because I couldn't move it like, I couldn't lie down or sit down in a comfortable position, and I couldn't, well, my wife had to put me to bed and help me undress and dress and put me to bed and in the mornings she would have to do the same thing. * * * I couldn't even climb up to my own stairs, I had to crawl up the stairs, in order to get up there."

Plaintiff was 34 years of age at the time of his 1954 injury. He had been a boiler maker by trade for about 16 years. When such work was slack in September 1954 he began to work as a glazer and in December 1954 he was earning $130 per week for a forty-hour week. After the receipt of his last injuries, plaintiff received intermittent medical treatment from physicians, osteopaths and chiropractors. The medical expense paid from December 7, 1954 to January 30, 1955, was $230.61. The total medical and hospital expense including the surgery was $1460.61 and the total loss of earnings to the date of the trial was approximately $2262.75 or a total of $3723.36

for loss of earning and hospital and medical care. Plaintiff had only worked four days in a supervisory capacity after surgery and prior to the trial of the cause on October 15, 1956. This work did not require much manual labor. Plaintiff's weight had dropped from 196 pounds to 176 pounds. He was still weak and he tired easily, but his back did not pain like it did prior to the operation.

Concerning plaintiff's foot injury, appellant says that it has found "no decisions exactly similar with reference to the injury," but suggests that "from a comparative standpoint $5,000 would constitute a generous award." Appellant cites McGarvey v. City of St. Louis, 358 Mo. 940, 218 S.W. 2d 542, 546.

As to the intervertebral disc injury, appellant "submits that, upon the evidence and under all of the comparative cases, an award of from $15,000 to $20,000 would be more than adequate for the injuries and disabilities suffered." Appellant cites Parks v. Thompson, Mo.Sup., 285 S.W.2d 687, 694; Carpenter v. Middlewest Freight Ways, Inc., Mo.Sup., 259 S.W.2d 816, 819; Rosenberg v. Terminal R. Ass'n, Mo.Sup., 159 S.W.2d 633, 636. The cases relied upon are, in numerous respects, distinguishable upon their facts from the present case.

"Where, as in this case, the trial court has ruled a motion for a new trial upon the amount of the verdict, which we have said amounts to a ruling upon the weight of evidence, this court, whether on appeal of plaintiff or defendant, will look to see whether the evidence, viewed in the light most favorable to the ruling, affords reasonable and substantial support of that ruling. If it does, then it must be sustained." Roderick v. St. Louis Southwestern R. Co., Mo.Sup., 299 S.W.2d 422, 429.

The trial judge saw and heard the witnesses and it is evident that he gave the question of damages careful consideration before ordering a remittitur of $15,000.

Where the trial court has considered and passed upon the matter of excessiveness and has ordered a substantial reduction, as here, we are usually reluctant to order a further reduction. Gieseking v. Litchfield & Madison R. Co., 344 Mo. 672, 686, 127 S.W.2d 700, 708; Willis v. Atchison, Topeka & Sante Fe R. Co., 352 Mo. 490, 178 S. W.2d 341, 347.

There is no precise formula for gauging whether a verdict is excessive. Each case depends upon its own peculiar facts. Consideration must be given the nature and extent of the injuries and losses, plaintiff's age and his diminished earning capacity, if any, the changing economic factors and the amount of compensation awarded and approved in cases similar or of fairly comparable injuries. The ultimate test of excessiveness or of inadequacy of an award is what will fairly and reasonably compensate for the injuries sustained. Brown v. Payne, Mo.Sup., 264 S.W.2d 341, 348; Roderick v. St. Louis Southwestern R. Co., supra.

We have read and carefully considered all of the cases cited by the respective parties on the issue presented. These cases are not particularly helpful in view of the facts before us. Appellant concedes that in herniated disc cases this court has approved verdicts ranging from $9,000 to $50,000 depending upon the particular facts shown.

While no closely similar cases have been found or cited, still, on the record presented here, we think the judgment, as finally entered should be affirmed. See Cleghorn v. Terminal R. Ass'n of St. Louis, Mo.Sup., 289 S.W.2d 13; Dempsey v. Thompson, 363 Mo. 339, 251 S.W.2d 42; Dickerson v. Terminal R. Ass'n of St. Louis, Mo.Sup., 284 S.W.2d 568; Hayes v. Wabash R. Co., 360 Mo. 1223, 233 S.W.2d 12, 19; Pinter v. Gulf, Mobile & Ohio R. Co., 362 Mo. 887, 245 S.W.2d 88.

The judgment is affirmed.

All concur.