**Harold A. GOODMAN (Plaintiff), Respondent,**

v.

**MISSOURI PACIFIC RAILROAD COMPANY, a Corporation (Defendant), Appellant.**

**No. 46104.**

Supreme Court of Missouri,

Division No. 1.

April 14, 1958.

George W. Holmes, Mark M. Hennelly and Allen D. Churchill, St. Louis, for appellant.

Charles E. Gray, St. Louis, Terry, Jones & Welton, Kansas City, for respondent.

DALTON, Judge.

This is an action under the Federal Employers' Liability Act (45 U.S.C.A. § 51, et seq.) to recover damages for personal injuries alleged to have been sustained by reason of defendant's negligence. Verdict and judgment were for plaintiff for $16,000. On motion for new trial a remittitur of $3,000 was required and made and judgment entered for plaintiff for $13,000. Defendant has appealed.

Plaintiff, a machinist, employed in defendant's diesel shop in Kansas City was injured on July 9, 1954, when a heavy piston assembly fell and struck him on the back, right knee and ankle. Defendant did not contest the issue of liability but, at the opening of the trial, advised the jury as follows: "We do not intend to contest the question of liability or non-liability one way or the other * * *." Defendant's defense was based upon a written release alleged to have been executed by plaintiff on September 21, 1954, in settlement of his claim in consideration of the payment of $15 by defendant. Plaintiff alleged the $15 was not accepted in full settlement and payment for the injuries sustained, but was in-

tended only as a release for the one day's wages lost by plaintiff immediately following the receipt of his injuries. He further alleged that "both plaintiff and defendant were mutually mistaken as to the nature, character, and extent of said injuries"; that the amount paid was grossly inadequate; and that the execution of the release was based upon a mutual mistake of fact.

On this appeal, defendant first contends that the court erred in overruling its motion for a directed verdict because "plaintiff failed to prove by the greater weight of the credible evidence that the contract of release he made with defendant is tainted by a mutual mistake of a past or present fact material to the contract under which both parties acted." Defendant further insists that "plaintiff's claim that the contract of release was entered into by mutual mistake is not supported by clear and convincing proof that plaintiff suffered any unknown injuries in the accident and that those injuries were unknown to plaintiff at the time he entered into the contract of release."

The piston assembly, weighing 305 pounds, fell a distance of four feet or more and struck plaintiff in the back while he was leaning over to clean some grease off of his shoe. Plaintiff said it hit him in the back, "just a little above the belt line * * * spun me around and slid down my knee and down against my ankle." He was carried on a stretcher to the first aid room and then removed to St. Mary's Hospital. He had a cut on his right ankle and bruises on his right knee and from his knee on down. His back was bruised and his ankle and lower leg was paining. At the hospital he complained of soreness over the left lower ribs and said his leg was hurting. X-rays were taken of his back and ankle. They were negative and disclosed no injury. No treatment was administered to his back, but his leg and ankle were bandaged. The incident happened on Friday and, on the following Tuesday, plaintiff returned to work with the loss of only one day's work. He had had no prior trouble with his back, leg or knee and had had no difficulty lifting. He returned to the hospital on the following Monday to have the dressing changed on his ankle. On July 27, 1954, he visited the hospital because his back was hurting and he was given some capsules. Plaintiff's right leg and ankle were black and blue for two and a half months. There was also a large bump and several knots along his leg, but he continued working and, on September 21, 1954, signed the release in question and received and cashed the check for $15.

Prior to the settlement plaintiff signed a written statement to the effect that when he returned to work on July 13, 1954, he felt he had fully recovered and was able to resume his usual and ordinary duties as a machinist. The release, executed in September, purported to be "in full release, discharge and satisfaction for all damages and personal injuries including both known and unknown injuries and future developments thereof growing out of or in any way resulting from * * *" the July 9, 1954 occurrence. Plaintiff admitted that he signed the release and endorsed the check given in payment and testified that he was in possession of his faculties and knew what a release was when he signed it. He thought he knew what he was doing and "thought it was all right." There were no threats, pressure, representations, or arguments. Plaintiff testified that defendant's agent, Calvert, said: " 'I'll fix you up for the day that you lost,' and I said, well, why not fix me up for the full day, which was sixteen dollars and twenty-four cents, and he said, 'fifteen dollars is all I can give you.' " Calvert asked him to sign and he did sign. Plaintiff further testified "The doctor excused me and told me I was all right, so I settled for the day's pay. * * * I signed it, involving a day's pay. * * * I told him I thought I was completely recovered. * * * I was satisfied for the day's pay at that time. * * * Well, I was still having some back trouble

and my knee was still bothering me, but the doctor told me it would be all right. * * * Well, my knee was sore so I couldn't walk very well with it at that time." He did not tell Calvert about his trouble with his back and knee, because he had been told that they "would get all right. * * * I thought that I was all right, but I wasn't." Dr. Castles informed him that he "would be all right." "Well, they told me I was able to go back to work, and I was released and I would be all right to do it. They said it would take a little time for the soreness and the aching to go out." The soreness and aching did not go out of his back.

After the settlement was made plaintiff continued to work regularly until November 26, 1954, when knee trouble developed. He thought at first it was a little boil. It got sore, became infected and he was taken back to the hospital, where he remained four days and received "hot pack" treatment. His back also began to bother him, it hurt to bend over and he could hardly lift anything. He continued to receive treatment for his knee as the wound was opened and drained four or five times. He was under medical care until January 8, 1955, and has since (except for two days) continued with his regular employment. He has changed jobs, but is working in a similar capacity "on the general overhaul job." His loss of earning during the period from November 26, 1954 to January 8, 1955, amounted to $455.

Defendant's position with reference to the back injury, both at the time the release was signed and at the time of the trial, is well illustrated by counsel's opening statement to the jury, as follows: "As to the back condition, Mr. Goodman was examined by two different doctors right shortly after his accident on July ninth. He complained of being struck on the left side of the back, the left shoulder, and he was X-rayed and examined thoroughly by a Dr. Frank L. Feierabend, an orthopedic and industrial surgeon in Kansas City. Dr. Feierabend found that Mr. Goodman had

some postural defects, or defects in the spine which resulted from bad posture; it could have resulted from a childhood illness or from any unknown source, but they were not the result of any injury. * * * He is of the affirm (sic) opinion there was no injury to the man's back. He released the man immediately to go back to work and told him there was no injury to his back." It was also defendant's position that plaintiff's knee trouble or inflammation of the knee joint, for which plaintiff received medical treatment and now complains, was not caused by the injury of July 9, 1954. Defendant's medical evidence was to the effect that plaintiff's knee trouble (bursitis) was produced by constant kneeling on a hard floor while at work, which produced an irritation of the prepatella bursa; and that the back soreness and pains were due merely to faulty posture or curve in the back acquired by walking and sitting improperly.

The record shows that on August 11, 1954, prior to the execution of the release, Calvert, defendant's claim agent who made the settlement, had written Dr. J. E. Castles, in regard to his efforts to settle with plaintiff in part, as follows: "Conferred with him today at the shops, and in an endeavor to settle with him for his lost time he stated the doctor told him it wouldn't be necessary for him to come back to his office any more unless he experienced some trouble. He went on to say there was a couple of knots on the side of his foot yet and a vein or artery was still sore or enlarged, and he did not want to close his claim out until it was certain the knots would or had gone away, and that there would be no possibility of an open or running sore result from this injury. I note on the surgeon's report referred to indicates there will be no permanency (sic) result, but was wondering if the doctor still had that same opinion when he last saw him, possibly the man is just being cautious but from my observation of it it would appear unduly so * * *." Plaintiff did not report for further examination.

Calvert also testified that "the man only lost one day and I didn't figure that he was injured too much, or he wouldn't be able to return to work."

Plaintiff received no medical treatment from July 27, 1954, until November 26, 1954, long after the settlement was made. The hospital record made July 9, 1954, showed that an ace bandage was applied to plaintiff's ankle, that there was tenderness over the dorsal spine; and that there was "no evidence of traumatic changes of the vertebral bodies or their processes or the ribs." As stated, the X-rays of the back and ankle taken July 9, 1954, revealed no evidence of fracture or bone pathology. The examining physician found nothing that would keep plaintiff from working and thought he should resume his normal occupation. Prior to the settlement plaintiff had received no treatment of his back, except that an X-ray was taken on July 9, 1954 and he was given some capsules on July 27, 1954. Considered favorably to plaintiff, there was substantial evidence tending to show that, when the release was executed, both parties believed and had reason to believe that plaintiff had sustained no real, serious, or permanent injury of any kind and particularly none to his back.

On plaintiff's evidence; the parties to the release and settlement were mutually mistaken as to the existing facts with reference to nature, character and extent of plaintiff's injuries, since plaintiff's injuries were both serious and permanent. The evidence shows that plaintiff had long had a pre-existing scoliosis and lordosis, a deformity of the back. "The spine revealed a definite curvature with the lateral dorsal curvature convex to the right, and concave to the left, which means the curve of the spine was to the right side,—there is a compensatory curvature in the lower dorsal region and· upper lumbar spine with the convexity to the left side." A man with· such a spine is more susceptible to an injury of the compression type as a result of trauma. A 305 pound weight falling several feet and striking a man on the back would have sufficient force to damage even a normal back. When examined on July 7, 1955 (about one year after the injury), X-rays of the dorsal spine, showing the bodies of the vertebrae, showed the eighth dorsal to be somewhat smaller in size and narrower than the bone above. The X-rays also showed a narrowing of the inner space between the eighth and ninth dorsal vertebrae. Plaintiff had pain along the course of the 10th, 11th and 12th vertebrae and the nerves that follow the 9th rib. The intervertebral spaces on either side of the eighth dorsal vertebra did not show on the X-ray taken of plaintiff's spine at the hospital on July 9, 1954, since it was apparently taken for other purposes. Plaintiff's medical witness further testified: "I think what probably happened was a compression of the spine due to a blow in the back, and I think that is evidenced by the changes in the eighth dorsal vertebra, and the typical radiation of pain that he gets from this area around to the front part of the chest." The radiating pains of which plaintiff complained were primarily caused by nerve root irritation, or nerve root pressure. The witness further testified that there were "obviously some changes resulting from the accident"; that "there must have been some rupture of the supporting ligaments around the eighth and ninth vertebrae"; and that "I think he will always have back trouble, both because of his pre-existing scoliosis and the deformity, and also because of the fact that he has a condition at the level of the eighth inner-space, which I'm sure will not be corrected by any type of means." Plaintiff testified: "Sometimes I have a spell where I'll be in misery all day long. * * * It still pains me in the evening and sometimes all day. * * * It don't seem like its gotten any better. It still pains me." The pains in the side of his chest are increased by bending, stooping or lifting. There is some rigidity and muscle spasm in his back. With any movement of the back the muscles on the left side contract much more severely than they do on the right side.

Plaintiff's evidence further showed that the difficulty with his knee from November 1954 to January 1955, was acute prepatellar bursitis requiring a portion of the bursa to be removed. Plaintiff's medical witness testified: "Well, I think the knee and the leg injury, the right knee and leg injury was one due to severe contusion which probably extended from the knee down to the ankle, and the contusion caused a break in the veins of the leg which lead to some transmission of blood outside the veins and subsequently caused pigmentation of the skin near the ankle and also led to some evacuator damage to the inside of the veins which has allowed the veins to dilate and become in a condition of varicose veins. The bursitis that he has is a chronic type of bursitis with a tumor in the wall and in the skin over the bursa. This tumor may be of fibrosis formation or any other type of formation * * * I believe that the severe contusion of the leg as a whole, and to the long saphenous vein, in particular, was the chief cause of the bursitis developing. * * * I also think that perhaps he eventually is going to have to have the veins removed from the leg, the veins in the lower part of the leg." There is also some swelling of the ankle. Clearly, plaintiff's evidence tended to show that he in fact sustained serious and permanent injuries on July 9, 1954.

Appellant points out that a mutual mistake of fact, which will give rise to an action of recision on the part of a party to a contract of release, must be a mistake regarding past or present facts material to the contract. Appellant then insists that plaintiff was aware of the fact that he had a back injury and pains in his back when he signed the release, but that Calvert did not know about it, since plaintiff did not tell him. Appellant further contends that plaintiff not only failed to offer clear and convincing proof of the existence of unknown injuries, but rather showed that he was aware of the knots in his leg and pains in his back when he executed the release.

Appellant's theory is that plaintiff had full knowledge of the existence of all of the injuries of which he now complains and that these known injuries only proved to be more serious than plaintiff anticipated when he signed the release, citing Chicago & Northwestern R. Co. v. Wilcox, 8 Cir., 116 F. 913; Kiloski v. Pennsylvania R. Co., D.C., 96 F.Supp. 321.

We think the evidence hereinbefore reviewed was sufficient to support the submission of the issue of mutual mistake of fact. Under the circumstances shown, plaintiff's knowledge of some soreness and some aches and pains in his back was not the equivalent of knowledge of an injured disc or of a severe and permanent injury. Neither of the parties to the release knew that plaintiff had sustained an injury to an intervertebral disc between the 8th and 9th dorsal vertebrae as plaintiff's evidence tended to show. The court did not err in submitting the issue of mutual mistake of fact to the jury. Prince v. Kansas City Southern R. Co., 360 Mo. 580, 229 S.W.2d 568, 573; Cleghorn v. Terminal R. Ass'n of St. Louis, Mo.Sup., 289 S.W.2d 13; Callen v. Pennsylvania R. Co., 332 U.S. 625, 68 S.Ct. 296, 92 L.Ed. 242.

Appellant next contends that the court erred in giving Instruction No. 1 by which the issue of mutual mistake of fact was submitted to the jury. The instruction, in part, submitted a finding that both plaintiff and Calvert had been advised that plaintiff had suffered no injuries of a permanent nature and both Calvert and plaintiff relied upon the information furnished. The instruction then proceeded as follows: "* * * and if you further find and believe from the evidence that the amount so paid to plaintiff was in whole or in part determined by a belief of plaintiff and a reliance of the claim agent on said report so received by said doctor that plaintiff had sustained no permanent injuries, and by a belief that any physical disabilities and pains which plaintiff may have been suffering from at said time would soon disap-

pear, and that said injuries would not interfere with plaintiff's ability to work and labor in the future * * *." The instruction further submitted a finding that plaintiff did on July 9, 1954 sustain permanent injuries to his right leg and back and that plaintiff and Calvert were mutually mistaken as to the character and extent of plaintiff's injuries, before telling the jury that, if they so found, the release was not binding.

■ Appellant complains of the use of the words, "in whole or in part," as combining the elements of contract and tort, and further states its position as follows: "Reliance in whole or in part on physical facts and medical reports pertaining to them is a far cry from requiring the jury to hear clear and convincing proof of the existence of mutual mistake of fact, and defendant submits that to give the jury the right to find mutual mistake of fact on any basis other than *complete and total reliance* by the parties on a mistake of fact is error." (Italics ours.)

It was not necessary that the mutual mistake of fact be the sole inducing cause for the execution of the release. See Jeck v. O'Meara, 343 Mo. 559, 122 S.W.2d 897, 903; Bedell v. Daugherty, 362 Mo. 598, 242 S.W.2d 572, 575; Weston v. American Nat. Assur. Co., Mo.App., 32 S.W.2d 789, 791. The mistake was with reference to a material fact.

■ Appellant further complains of the instruction as incorrectly stating the law pertaining to the element of consideration in contracts, in that it "allows the jury to find the amount of consideration paid to plaintiff *as an essential factor* in determining the existence of a mutual mistake in order to determine the validity of the contract." (Italics ours.) Appellant also says that "the instruction does not require the jury to find that the execution of the release must be the direct result of the existence of a mutual mistake of fact upon which both parties relied before finding the release invalid." Appellant further insists "that plaintiff instructed the jury to consider the amount of the settlement as evidence of a mistake of fact without further instructing the jury that such evidence would be circumstantial only. * * *."

■ We think the instruction required a finding of the essential facts to sustain a finding of mutual mistake of fact and that the further required finding that the amount paid was at least partially determined by a mutual mistake of fact did not make the instruction prejudicially erroneous. The instruction must be read and considered as a whole and together with all the other instructions given to the jury. Henderson v. Dolas, Mo.Sup., 217 S.W.2d 554, 557. When so considered we do not find the instruction prejudicial in the respects mentioned.

■ Appellant's final contention is that the verdict is "extremely excessive." As stated, the trial court found the $16,000 verdict excessive and required a $3,000 remittitur, which was entered. Appellant's theory that the $13,000 remaining is still excessive is essentially based upon the proposition that plaintiff lost only $455 in wages and has continued to be regularly employed, except for two or three additional days. Appellant says "there is no evidence he cannot work today."

Considering the evidence in a light most favorable to plaintiff, as we must, it appears that plaintiff part of the time has to wear a nylon brace with stays in it to support his back. In the evening, when he gets through working, his back starts aching and sometimes it's bad. When the pain and aching eases up, he takes off the brace for awhile. Most of the trouble he has with his knee is when trying to climb stairs or going up an incline. The knee pains and he can't raise his weight on it and has to use his hand to help it along. If he stands for any period of time, he must put his weight mostly on his left leg.

Plaintiff's medical evidence tended to show that the bursa is normally a sac-like

structure which acts to offset friction or pressure against the bones in the knee. The injury to plaintiff's leg led to the transmission of blood outside the veins and this subsequently caused the pigmentation of the skin near the ankle. The injury also caused damage to the veins resulting in varicose veins. The contusion of the leg and the injured vein was the cause of the bursitis, which is now of a chronic type, and there is also a tumor in the wall over the bursa. The tumor has the appearance of a sebaceous cyst and is about the size of a walnut. The varicose veins are permanent and may require a stripping operation and the wearing of an elastic stocking. The injury to the leg caused the condition of the knee. Plaintiff limps around and has been moving slower and slower all the time in his work. He had had no previous knee trouble.

In addition to the facts hereinbefore stated with reference to the injury to plaintiff's back the evidence shows there is some restriction in bending his back both to the side and laterally and also in forward and backward movements. He has what his medical witness refers to as a typical radiation of pain from the region of the eighth dorsal vertebra to the front part of the chest caused by nerve root irritation. There is not much chance of correcting this condition and the best thing he can do is to wear a back support. The pain appears to be due to a pinching of nerve roots at the level of the eighth inner space. His condition is painful and permanent. Plaintiff was 56 years of age at the time of the trial in November 1956. Plaintiff has worked for defendant since sometime in 1924. His salary when injured was $2.03½ an hour for an eight hour day.

■ There is no precise formula for gauging whether a verdict is excessive. Each case depends upon its own peculiar facts. Consideration must be given the nature and extent of the injuries and losses, plaintiff's age and his diminished earning capacity, if any, the changing economic factors and the amount of compensation awarded and approved in cases similar or of fairly comparable injuries. The ultimate test of excessiveness or of inadequacy of an award is what will fairly and reasonably compensate for the injuries sustained. Brown v. Payne, Mo.Sup., 264 S.W.2d 341, 348; Roderick v. St. Louis Southwestern R. Co., Mo.Sup., 299 S.W.2d 423, 429.

■ Appellant relies on Baker v. Kansas City Terminal R. Co., Mo.Sup., 250 S.W.2d 999, 1007; Harvey v. Gardner, 359 Mo. 730, 223 S.W.2d 428, 433(11). In neither case were the injuries sustained as severe as the injuries shown by the record in this case, where we have both the injuries to plaintiff's back and to his right knee and leg. We think the verdict reflects a finding by the jury of the seriousness of the injuries in the respects mentioned by plaintiff and his witnesses. We must consider the evidence in a light most favorable to the verdict.

■ The trial judge saw and heard the witnesses and it is evident that he gave the question of excessiveness careful consideration when ruling the motion for new trial, since he ordered a remittitur of $3,000. Where the trial court has considered and passed upon the matter of excessiveness and has ordered a substantial reduction, as here, we are usually reluctant to order a further reduction. Parlow v. Carson-Union-May-Stern, Mo.Sup., 310 S.W.2d 877.

On the record presented, we do not find the amount for which judgment was entered by the trial court sufficiently excessive, if excessive at all, to require a further remittitur. Compare Dickerson v. Terminal R. Ass'n, Mo.Sup., 284 S.W.2d 568, 575 (where plaintiff was younger and more seriously injured.)

The judgment is affirmed.

All concur.