Harry **WESTFALL**, Respondent,

v.

**MOSSINGHOFF, J. & COMPANY,** a Corporation, **Appellant.**

No. 47621.

Supreme Court of Missouri,

Division No. 2.

April 10, 1961.

Lusser, Morris & Burns, John J. Morris, St. Louis, for appellant.

Goldenhersh & Goldenhersh, Samuel J. Goldenhersh and Frank J. Lane, Jr., St. Louis, for respondent.

LEEDY, Presiding Judge.

Action for damages for personal injuries. The jury found for plaintiff, assessed his recovery at $17,500, and judgment was entered for that sum. After an adverse ruling on an alternative after-trial motion (to set aside verdict and judgment and to have judgment entered in accordance with its motion for a directed verdict, or for new trial), defendant appealed. We refer to the parties as designated in the trial court.

Plaintiff, a plumber's helper, then about 58 years of age, was injured when defendant's machine tool, a large hammer, operated by compressed air (alternately referred to as a jack hammer or air hammer) fell across the left foot of plaintiff, inflicting serious personal injuries. He was in the employ of a St. Louis plumbing contractor, Joseph Sprenke. Plaintiff's duties required his presence at the time and place of the casualty (in the 2800 block of Pennsylvania Avenue in the City of St. Louis on the morning of Dec. 26, 1957) for the purpose

of taking part in connecting a new service line from the street to adjacent property, a job which involved breaking the pavement of the street for that purpose. The jack hammer was described as being about three feet high, and having a point or spike on it; small at the top "and then it tapers out wide across the middle, and then tapers down small where the point goes in. It has two springs on the end where you fasten the point in." The construction of the unit was such that the hammer part could be detached from the air compressor by unhooking the hose by which they were coupled. (Defendant's answer to one of plaintiff's interrogatories gives 55 pounds as the weight of the jack hammer.)

Defendant's first contention (that the court erred in overruling its motions for a directed verdict) raises the question of whether the evidence made a submissible case within the res ipsa loquitur rule. The facts relevant to the point are brief, and, we may add, somewhat sketchy. They appear exclusively in the testimony of plaintiff, the sole witness in the case on the issue of liability; but neither his direct nor cross-examination extended into particularities, and this is especially true with respect to the delineation of facts and circumstances directly connected with and immediately surrounding the accident. On the present issue the facts may be thus summarized: Plaintiff reported for work at about 8 A. M., at the place in question, where, as he stated, "we was supposed to break a hole in the street and connect a new service line—the old one was bad—pull the old service line out and put a new one in." His employer, not having a jack hammer, ordered one from defendant. ("He called Mossinghoff to bring out a breaker to break the street.") Arriving on the scene about 9:15 or 9:30 A. M., the jack hammer was delivered by panel truck, to the rear of which was attached a trailer carrying the air compressor. This outfit was driven by an individual variously referred to as "Mr. Mossinghoff," "Mossinghoff," "defendant's man," and "the man that brought the equip-

ment." No one accompanied him. (From defendant's answer to an interrogatory, it appears that this man's name was Donald T. Mossinghoff, and that he was an employe of defendant. For convenience, then, he will be referred to by the name Mossinghoff.) In addition to plaintiff and Mossinghoff, the only other person present at the job was Bob Sprenke, the son of plaintiff's employer, a youth of about 20 who was an apprentice.

Plaintiff saw Mossinghoff take the jack hammer off the truck, and the next thing he saw was when he (plaintiff) turned around and the jack hammer was falling on his foot. He did not have occasion to notice whether the jack hammer was attached to the compressor; he didn't look that close.

"I saw it on the ground the first time before he drug it over to us.

"Q. What were you doing when he drug it over? A. I had my back turned, putting on my gloves—it was chilly weather—after Christmas—and I started to turn around and by that time it was too late, it was on my foot.

"Q. What did you see when you turned around? A. I saw the jack hammer just leaving, going for my foot and I couldn't jerk my foot back quick enough."

Mossinghoff was standing there next to it, but plaintiff did not see Mossinghoff holding it before it fell. Bob Sprenke was two or three feet from plaintiff when the jack hammer hit his foot, but plaintiff was facing south, so he could not see what Bob was doing. The latter "was supposed to help out on the job * * * there was no boss."

Plaintiff was a foot and a half or two feet away from the compressor when he was putting his gloves on. He started to put his gloves on when Mossinghoff started to unload the jack hammer. He did not see anyone get any air hose out of the truck, nor did he see any about the street there.

Mossinghoff was supposed to operate the jack hammer, "but he was hurt—they say—Joe told me—called over the 'phone that he dropped a manhole cover on his foot and we had to help him with the jack hammer. * * * I was going to help the man, you see." Plaintiff had never operated a jack hammer. Just before Mossinghoff arrived with the equipment plaintiff had marked off with a crayola where the pavement was to be broken—a break "just big enough for us to get down in there to measure the connection." After the accident plaintiff had no conversation with Mossinghoff (nor, for aught that appears, before, either)—"I never said nothing to him and he didn't say nothing to me either * * * never said nothing."

Appellant cites numerous Missouri authorities on the question of the applicability of the res ipsa doctrine, and respondent cites the same cases plus a few others. None are asserted to be factually so similar as to be controlling here. They apply or decline to apply the doctrine under variant circumstances. In this situation, we forego discussion of the individual cases, except the one which plaintiff asserts is closest factually to the one at bar, Removich v. Bambrick Bros. Const. Co., 264 Mo. 43, 173 S.W. 686, L.R.A.1917E, 233—of which later. The general teaching of the cases, which will be sufficient for our purposes, has been repeatedly expressed in this language: "It is firmly established in our jurisprudence that the res ipsa loquitur doctrine only applies when: (a) the occurrence resulting in injury was such as does not ordinarily happen if those in charge use due care; (b) the instrumentalities involved were under the management and control of the defendant; (c) and the defendant possesses superior knowledge or means of information as to the cause of the occurrence. Clark v. Linwood Hotel, 365 Mo. 982, 291 S.W.2d 102, 104–105, and McCloskey v. Koplar, 329 Mo. 527, 46 S.W.2d 557, 559, 92 A.L.R. 641." Layton v. Palmer, Mo., 309 S.W.2d 561, 564, 66 A.L.R.2d 1242. See, also, Gateway Chemical Co. v. Groves, Mo., 338 S.W.2d 83, 85–86; Golian v. Stanley, Mo., 334 S.W.2d 88, 93; Parlow v. Carson-Union-May-Stern Co., Mo., 310 S.W.2d 877, 881; Leisure v. J. A. Bruening Co., Mo., 315 S.W.2d 705.

The Removich case, relied on by appellant and which held the res ipsa rule inapplicable, was decided on a question of pleading—that is, the sufficiency of the allegations of the petition therein. Plaintiff was employed as a laborer to dig in the bottom of a large trench preparatory to building a sewer therein. Defendant used a steam-powered hoisting machine for the purpose of lifting buckets of earth and soil from the bottom of the trench to a point above the surface of the street, thence along a steel track to a point where it was dumped back into the trench, and upon the completed portion of the sewer line. Plaintiff was injured when the iron or steel cable attached to one of the buckets being conveyed over and above his head broke causing the bucket to fall upon him. The petition did not allege any reason for the breaking of the steel cable, and it was held to be "the duty of plaintiff to state such affirmative facts, touching the manner of the happening of the casualty, as to negative, by fair inference, the theory that it occurred by reason of some efficient defensive cause precluding, as a matter of law, the liability of defendant." [264 Mo. 43, 173 S.W. 690] This was but another way of saying that the petition failed to disclose a state of facts which would exclude every reasonable hypothesis except that of defendant's negligence. But the rule thus declared and applied no longer prevails in this jurisdiction. The current view is that, "If a plaintiff in such a [res ipsa] case were required to produce evidence which would exclude every reasonable theory but that of the negligence of the defendant the doctrine would be annihilated.' Cruce v. Gulf, Mobile & O. R. Co., 358 Mo. 589, 594, 216 S.W.2d 78, 81. "Although there are statements in some cases indicating the contrary, yet it is true that in a res ipsa loquitur case plaintiff is not required to present evidence overthrowing

every reasonable theory of nonliability on the part of the defendant." Warner v. Terminal R. Ass'n of St. Louis, 363 Mo. 1082, 1091, 257 S.W.2d 75, 79. "'The attendant facts must raise a reasonable inference of defendant's negligence but they need not also exclude every other inference.' Maxie v. Gulf, Mobile & Ohio R. Co., 358 Mo. 1100, 219 S.W.2d 322, 325(5), 10 A.L.R. 2d 1273; Baugher v. Gamble Const. Co., 324 Mo. 1233, 26 S.W.2d 946, 950; Warner v. Terminal R. Ass'n of St. Louis, 363 Mo. 1082, 257 S.W.2d 75, 79; Cantley v. Missouri-Kansas-Texas R. Co., supra, 183 S.W. 2d 123, 127." Parlow v. Carson-Union-May-Stern Co., Mo., 310 S.W.2d 877, 881. See, also, Hanson v. Dalton Coal & Materials Co., Mo.App., 264 S.W.2d 897, 903.

■ Defendant contends that the evidence fails to disclose a factual situation which satisfies any of the three elements requisite to the application of the res ipsa doctrine as recited in the formula hereinabove set out, viz.: "(a) The occurrence resulting in injury was such as does not ordinarily happen if those in charge use due care; (b) the instrumentalities involved were under the management and control of the defendant; (c) and the defendant possesses superior knowledge or means of information as to the cause of the occurrence." We do not agree. On the contrary, we have no difficulty in viewing the evidence as satisfying all such elements because it shows an unexplained, unusual happening the attendant circumstances of which reasonably warrant an inference that the negligence of the defendant was the proximate cause of the occurrence which produced the injury. It will be recalled that plaintiff saw the jack hammer safely unloaded from the truck, and placed on the ground. Mossinghoff then dragged it over to where plaintiff was standing, and the next thing plaintiff saw was when he turned around, and the jack hammer was falling on his foot. Under these circumstances (and as more fully developed above), the jury could reasonably find that such a jack hammer about to be used on a job would not ordinarily fall over so as to strike a nearby workman standing with his back to it if those in charge had used due care. In other words, such an occurrence is ordinarily not to be expected in the absence of some defect in the apparatus, or some negligent user or act.

The evidence does not support any inference other than that at the time of the occurrence the jack hammer was under the management and control of Mossinghoff, and as the agent or employe of defendant, his control was that of the defendant. He delivered the equipment to the job and unloaded the jack hammer. It is true the evidence discloses that it was contemplated that both plaintiff and Bob Sprenke would assist Mossinghoff in the performance of the work of breaking the pavement, but neither the general nor precise form that such contemplated assistance would take appears, nor does the time when it should or did (if ever) commence, so that it is clear that at the time of his injury plaintiff had not embarked upon any service to Mossinghoff by which he could or should be deemed to have shared the management or control of the offending instrumentality. The fact that the jack hammer fell and struck plaintiff under the circumstances referred to bespeaks negligence, and defendant's superior knowledge thereof, since it owned, possessed and controlled the jack hammer. We hold plaintiff was entitled to submit his case to the jury under the res ipsa loquitur doctrine, and consequently the court did not err in refusing to direct a verdict in favor of defendant because of the insufficiency of the proof to make a case under that doctrine.

Defendant's next point (that the judgment be reversed outright, and not remanded for retrial upon another theory) need not be noticed because it presupposes an adjudication, on the first point raised, that the facts of the case do not bring it within the res ipsa doctrine, a proposition directly contrary to what has just been held.

■ Plaintiff's verdict-directing instruction at two places mentioned or refer-

red to defendant as "Mossinghoff, J. & Company, a corporation *doing business as Concrete Breaking Company*"—first, in submitting the hypothesis of plaintiff's employer having engaged the defendant (as thus described) to bring an air compressor and jack hammer for the purpose of making a break in the street; and secondly, as the concluding words of the instruction, in directing that if the facts be found as therein submitted, the verdict "should be in favor of the plaintiff and against the defendant Mossinghoff, J. & Company, a corporation *doing business as the Concrete Breaking Company.*" It is charged that the descriptive words italicized above rendered the instruction reversibly erroneous because "that element was not supported by the evidence," and because "particularly prejudicial to defendant in view of the evidence that it was plaintiff who was to break into the street." It is true there was no evidence *before the jury* concerning the matter, but the fact that defendant was doing business in the name thus attributed to it appears in defendant's answer to plaintiff's interrogatory directed to that precise question. The offending words amounted to nothing more than an assumption that defendant was doing business in that name, and, of course, it is elementary that it is not reversible error to assume in an instruction that which is conceded.

Plaintiff also assails the instruction's submission of the hypothesis of plaintiff's injury having been occasioned by some negligence on the part of defendant "through its employee" because the element of employment of defendant was allegedly lacking in evidentiary support. We have already ruled that the evidence was sufficient to satisfy the requirements of element (b) of the formula set out in our discussion of the point concerning the applicability of the res ipsa loquitur doctrine. That ruling is dispositive of the present contention, and adversely to appellant.

Plaintiff's instruction No. 7 on the measure of damages is charged to have been rendered "misleading, confusing, compli-cated, overlapping and prejudicial" by reason of the repetitious appearance and reappearance (in subparagraphs "first" to "fifth," both inclusive) of certain phraseology in relation to the permissibility of considering "ill effects" which naturally and necessarily flowed from plaintiff's injuries. The text of the instruction (offending verbiage we indicate in italics) was:

"The Court instructs the jury that if under the evidence and the other instructions of the Court you find in favor of plaintiff, you should award him damages and in determining the amount of his damages you should award him such sum as you find from the evidence will fairly, reasonably and fully compensate him for all injuries, if any, sustained on December 26, 1957, directly caused by the negligence of the defendant, as submitted to you herein, and the ill effects, if any, which naturally and necessarily followed from said injuries sustained on said date and in determining the amount of your verdict, you may take into consideration and account the following:

"First: Such pain and suffering of body and anguish of mind, if any, plaintiff has suffered by reason and on account of such injuries, if any, *and the ill effects, if any, which necessarily and naturally followed from such injuries.*

"Second: Such pain and suffering of body and anguish of mind, if any, plaintiff is reasonably certain to suffer in the future by reason and on account of such injuries, if any, *and the ill effects, if any, which naturally and necessarily followed from said injuries.*

"Third: For such permanent injuries, if any, plaintiff has suffered by reason and on account of said injuries, if any, *and the ill effects, if any, which naturally and necessarily followed from said injuries.*

"Fourth: For such loss of earnings, if any, you find from all the evidence

plaintiff has suffered by reason and on account of said injuries, if any, *and the ill effects, if any, which naturally and necessarily followed from such injuries.*

"Fifth: For such future loss of earnings, if any, you find from all the evidence plaintiff is reasonably certain to suffer by reason and on account of said injuries, if any, *and the ill effects, if any, which naturally and necessarily followed from such injuries.*

"Sixth: For such sum as you find from the evidence is the reasonable value of the medical services, if any, which you may find from the evidence plaintiff has necessarily become obligated for in the care and treatment of said injuries, if any, which naturally and necessarily followed from said injuries as directly caused thereby."

Defendant cites Moss v. Mindlin's, Inc., Mo., 301 S.W.2d 761, 768, and Murphy v. St. Louis Public Service Co., 362 Mo. 772, 779–780, 244 S.W.2d 31, 35–36, in support of its contention, and plaintiff relies on the same two cases. The form of the instant instruction is not precisely comparable to the measure of damage instruction under scrutiny in either of the foregoing cases, although it has some of the characteristics of both.

It will be observed that here the separately numbered subparagraphs specified certain items that might legitimately be considered in determining the amount of the verdict; for example, pain and suffering, past and future (subparagraphs 1 and 2). In no instance did the enumeration stop with a specified item. Instead, what was the jury told that it might also consider in that same connection? Says the instruction: "[A]nd the ill effects, if any, which necessarily and naturally followed from such injuries." Do the words "such injuries" as here used refer to the pain and suffering which had just been mentioned, or is the jury to understand that defendant is entitled to recover not only for pain and

suffering but also the ill effects of such pain and suffering? And so it is with each of the other specific items as submitted in said subparagraphs.

It is obvious that the instruction is what may fairly be called a fudging type of measure of damage instruction, whether actually so intended or not, because it unduly accentuates, and by parrot-like repetition calls attention to, and thereby emphasizes the ill effects aspect of plaintiff's case; but even so, in view of the disposition we find it necessary to make of the case, we do not determine whether the giving of this instruction in itself constituted reversible error. But we do take occasion to call attention to what was said in this connection in the Mindlin case: "We should observe that we do not commend the use of detailed and complicated damage instructions in the usual personal injury case. That, because it usually happens that the listed items which the jury is told it may take into account are somewhat overlapping. It would appear to be better practice to leave many of the suggested items for jury argument rather than to include them in a damage instruction. The use of shorter damage instructions would obviate questions such as here raised by defendant."

██ Defendant challenges the amount of the judgment, $17,500, as being grossly excessive. In considering that question, we view the evidence in the light most favorable to plaintiff, and, in consequence, defendant's evidence on the damage issue will be disregarded unless it aids plaintiff. The only witnesses on plaintiff's part were plaintiff himself, and his two treating physicians.

Plaintiff continued to work on the job in question during the remainder of the day of the accident, and the next day when he completed same. In the meantime he had not consulted a physician or received medical first aid of any kind, although he said his foot had become swollen and painful. He did see his physician, C. C. Kane, an M.D. in East St. Louis, Illinois, on

Dec. 27th, but this, we infer, was after he had worked all day. Dr. Kane caused X-rays to be taken, and the plaintiff to be put to bed at home in an effort to reduce the swelling so that a cast could be applied. Plaintiff was admitted to the hospital on Jan. 4, and nine days later, the swelling having sufficiently subsided, a cast was applied. He remained in the hospital two weeks, meanwhile having developed what he called "a dose of pneumonia," but which his physician said was "acute bronchitis with emphysema and asthma." (There was considerable evidence concerning plaintiff's physical condition as affected by an admitted chronic lung and chest condition which antedated the injuries sued for, but inasmuch as plaintiff disclaims any connection between the chest condition and the foot injury, it would serve no useful purpose to detail the evidence in relation to the former, although defendant claims such prior chronic condition was itself disabling.)

There is no dispute as to the fact that plaintiff sustained a comminuted fracture of the first and of the third metatarsal, and a linear fracture of the second metatarsal of the left foot. Plaintiff testified that his leg remained in a cast for two months. He used crutches for two and a half months, and afterwards a shoe with a special support. After he was able to walk without a crutch he had pain in his foot. As of the time of trial he still had some pain—"it throbs once in a while. Sometimes I don't feel any, and then sometimes I do." Walking brings on pain, and after six or seven blocks "then I start fagging out." Later, he said, "I ain't got no feeling in it. I only got pains shooting through there." Plaintiff further stated that in order to walk, he now limps, whereas before the accident he did not.

Dr. Kane testified the cast was removed before it should have been because the patient was complaining of pain, and "in order to give him exercise and heat therapy"; that he noted plaintiff walks with a limp or slight drag of his foot; there was some disturbance of the blood supply to the foot, and also an inflammatory condition which surrounded the nerves of the foot, both of which produced pain; there is some "slight" atrophy in the calf above the ankle which is attributable to nonuser of the leg. Plaintiff had made approximately fifty visits to his office.

Dr. Kane further testified that the X-rays indicated the position of the healed fractures to be "fair, but not perfect * * satisfactory, it is as good as you can get with that type of fracture"; he said the same thing as to the alignment of the bones; the apposition or contact of the bones was all right; the articular surfaces were "all right * * * satisfactory"; callus formation was satisfactory as shown in the X-rays, but he did not know its status as of the date of trial. The witness declined to testify as an expert X-ray man or as an expert orthopedist, but in his opinion the X-rays showed a very minimal degree of osteoporosis. As to deformities in the foot, he thought plaintiff "has some straightening of both the longitudinal and transverse arch in his foot," and that "there continues to be some swelling and I think there's a slight degree of difference in the temperature of the toes in the two feet." He never did check the pulsation or arteries, nor reflexes.

On Nov. 1, 1958, witness referred plaintiff to Dr. Killian Fritch, an orthopedist, because he was still complaining of pain and discomfort in the foot, and also "of a numb, tingling sensation besides the pain, which is typical of a bad circulation or endocarditis." Asked what would cause injury to the circulation, the witness answered, "Injury to his blood vessels and nerves in his foot." The witness gave it as his opinion that plaintiff's poor circulation and soft tissue damage was permanent, and that he would be unable to continue in the occupation of digging ditches.

Dr. Fritch, testifying on behalf of plaintiff, stated that the fractures had healed completely; that they were in good posi-

tion; that the alignment was fairly good— satisfactory, and the apposition of the bones satisfactory; there has been sufficient healing that the bony structure has been restored, and with an amount of callus "just as it should be"; that the X-rays showed atrophy of the bone, that "it looks sort of moth-eaten, and there's a loss of lime salts in the toes and in the heads of the metatarsals"; that he found no atrophy in the muscles. On the previous Monday witness had examined plaintiff, and found the circumference at the arch of the left foot to be ⅝ths inch larger than the right, and a person making judgments as to size could tell the foot was "swollen larger than the right foot." There was some osteoporosis still present in the toes distal to the transverse arch. The witness was of the opinion that plaintiff's pain was caused from impaired circulation, and that he would always have some difficulty with this foot if he works outdoors or does heavy work with it; he probably would not be able to dig ditches with a shovel although he would be able to do "factory work—things like that."

Plaintiff testified he was earning $2.77½ per hour when injured; that he "guessed" he had worked 8, 9–10 years, off and on, for Sprenke, whenever he was called, but he worked mostly for "big outfits." He stated he had not attempted to do any work around the house since the date of the accident, nor had he, since that time, "gotten a pay check from the Sprenke Company." (This, it may be said, is the extent of any direct evidence by plaintiff as a witness on the issue of his loss of earnings.) There was no effort to show his average annual earnings nor the average time he was actually employed, or that a plumber's helper would work, considering weather and related factors. It is inferable from defendant's proof that plaintiff was not physically able to resume work as lately as eight months after the casualty. So the evidence with reference to loss of earnings is at best somewhat indefinite and uncertain, hence we are required to reject plaintiff's argument that "a conservative estimate of plaintiff's loss of income at the time of trial would place it at more than $5,000.00." Plaintiff's outlay for medical expenses totalled $600. There was no proof (and apparently no claim) as to hospital expenses.

We are unable to know in what degree, if any, the criticized portions of instruction No. 7 may have affected the award, but in view of the nature and extent of plaintiff's physical injuries, and the present status of his recovery, as shown by the evidence, together with the unsatisfactory showing as to loss of earnings, we have concluded that judgment for the full amount assessed by the jury should not be permitted to stand. Consequently, if plaintiff will within 15 days, file here a remittitur of $5,000, the judgment will stand affirmed as of the date of its rendition for $12,500; otherwise, the judgment will be reversed, and the cause remanded. It is so ordered.

STORCKMAN, J., and BROADDUS, Special Judge, concur.

EAGER, J., dissents, believing that instruction No. 7 was prejudicially erroneous